# PANAMERICAN CONSULTING COMPANY, INC. *v.* BROUN ET UX.

(Two Appeals in One Record)

[No. 261, September Term, 1964.]

*Decided April 29, 1965.*

*Motion for rehearing and/or for revision of opinion filed May 25, 1965, rehearing denied June 2, 1965, and per curiam opinion filed, reported at 238 Md. 548, infra.*

The cause was argued before HAMMOND, MARBURY, SYBERT, OPPENHEIMER and BARNES, JJ.

*Charles O. Fisher* and *H. Vernon Eney,* with whom were *Norwood B. Orrick, Benjamin R. Civiletti* and *Venable, Baetjer & Howard* on the brief, for the appellant.

*Herbert M. Brune* and *Francis N. Iglehart, Jr.,* with whom were *Brune, Robertson & Iglehart* on the brief, for the appellees.

OPPENHEIMER, J., delivered the opinion of the Court.

The use of Maryland since colonial times as a base for international economic adventure is reflected in this appeal, which comes to us through one of the most technical of procedural actions.[1] The facts in this case are, to a certain point, virtually undisputed. We shall first set forth these facts; then the testimony as to certain transactions which occurred thereafter; then the nature of this litigation and the decision of the court below; and, finally, our determination of the legal issues involved.

I

In 1955, Olney Broun, then a resident of Mississippi, and Frank N. Hillis, a Maryland citizen, both of whom are chemical engineers, incorporated Panamerican Consulting Company, Inc., a Maryland corporation (Panamerican), for the purpose of designing, building and operating chemical plants outside of the United States, chiefly in Mexico, South America and Canada. Broun contributed $20,000 for 200 shares of common stock and $25,000 for 250 shares of preferred stock, both of the par value of $100 a share; these shares were issued in the names of Broun and his wife (the Brouns). Both Broun and Hillis were directors of Panamerican and Broun has remained a director for the entire period here involved. Hillis contributed the assets of a former unincorporated company owned by him, the Panamerican Consulting Company, in return for 750 shares of common

---

1. Over 100 years ago, the legal aspects of another foray into South America, involving the sending of a barque to the Lobos Islands for guano, came to us in a somewhat similar manner. Benson v. Atwood, 13 Md. 20 (1859). One of the counsel in that case was the grandfather of former Chief Judge Frederick W. Brune.

stock, and paid $5000 for shares of preferred stock. Otto K. Musall and B. V. Sterk are also chemical engineers who had worked for Hillis in his former company. They were engaged by Panamerican and Musall became a director of that company. In the course of Panamerican's operations, Hillis and Broun formed foreign subsidiary companies to build and operate the chemical plants; the assets of Panamerican largely consisted of the capital stock of these subsidiaries.

A major disagreement arose between Hillis and Broun in the fall of 1958. Broun had opposed a gift of Panamerican stock to Musall and Sterk. Hillis proposed that a company be organized in Panama to acquire all of Panamerican's assets in exchange for the issuance of stock to Panamerican which was subsequently to be issued to Panamerican stockholders in proportion to their stockholdings in Panamerican. Hillis set forth this proposed plan in a letter to Broun, dated December 12, 1958. Broun vigorously opposed this proposal because he felt he would lose control or supervision over his financial interests if all assets of Panamerican were transferred to a company in Panama.

Because of the disagreement between Broun and Hillis, negotiations ensued looking to the sale of Broun's interest in Panamerican. Hillis, on behalf of Panamerican, offered to purchase the Broun's stock in Panamerican for $30,000 and 1500 shares of the Panama corporation which was to be formed and which was to be known as "Cia. Promotora Panamericana, S.A." (Promotora). Panamerican withdrew its offer while the Brouns were still considering it. Promotora was formed in Panama on January 23, 1959. Broun continued in his opposition.

At a meeting of the board of directors of Panamerican, in Reisterstown, on April 16, 1959, a majority of the board voted to authorize the transfer of Panamerican assets to Promotora in exchange for its stock; Broun voted against it. The transfer of assets was effected as of March 31, 1959. Promotora issued 12,773 shares of its common stock of the par value of $10 a share (being all of the shares issued out of the authorized capital stock of 100,000 shares) and in exchange Promotora received Panamerican's assets of cash and common stock of for-

eign development companies. Hillis resigned as president of Panamerican and became chairman of the board of Promotora. Musall replaced Hillis as president of Panamerican and became treasurer and a director of Promotora. Broun became vice-president and a director of Promotora.

There were further negotiations between Broun and Hillis and their respective counsel to settle the disagreements between them. All agreed that the best solution was for Broun to sell his Panamerican stock but no agreement was then reached as to price. On March 3, 1960, Broun filed suit in the United States District Court for the District of Maryland against Panamerican, Hillis, Musall and Sterk to set aside the Promotora-Panamerican transaction. Broun sought the appointment of a receiver for Panamerican, unpaid salary and the fair value of his stock in Panamerican. The suit was a stockholder's action based on alleged fraud perpetrated by the officers and directors of Panamerican in the Promotora transaction and in the gift stock transfers to Sterk and Musall. The bill alleged, *inter alia,* that the transfer of funds from Panamerican to Promotora was *ultra vires,* illegal and fraudulent.

On April 30, 1960, the Brouns and Panamerican entered into an agreement of sale and settlement. This agreement recited the pending litigation in the United States District Court and provided for the sale of the 250 shares of preferred stock and the 200 shares of Panamerican owned by the Brouns to Panamerican for the sum of $80,000, of which $20,000 was paid on the execution of the agreement and the remainder of which was to be paid in stated instalments. Upon final payment of the full purchase price, Panamerican was entitled to receive from the Brouns a general release "of all claims against Panamerican, its present and former officers, directors and stockholders, including specifically Frank N. Hillis, Otto K. Musall and B. V. Sterk, * * *." The $80,000 was paid in full by Panamerican and Broun delivered the release, which was dated as of April 30, 1960, the date of the agreement of sale and settlement, which stated: "For value received the undersigned Olney Broun and Stella Norris Broun do hereby jointly and separately forever release and discharge Panamerican Consulting Company, Incorporated and its present and former officers, directors, agents

and servants including particularly Frank N. Hillis, Otto K. Musall and B. V. Sterk of and from any and all claims, demands, rights, actions and suits whatsoever based upon matters and facts arising prior to the date of this release."

II

During the months of January and April, 1960, there were transactions in respect of Promotora stock which are the basis of this litigation. On January 25, 1960, Musall received four certificates of Promotora common stock by mail which bore the signature of Hillis as president. On or about April 1, 1960, Musall received another four certificates of the stock by mail from Panamerican, which again bore the signature of Hillis as president. The total of the shares so received by Musall was 6844, of which 953 were in Broun's name. Of these 953 shares, 370 shares were received by Musall on January 25 and 583 on April 1. The other certificates were made out to Sterk for a total of 450; to Musall, for a total of 976, and 4456 shares to bearer, evidently for Hillis. Musall, the treasurer of Promotora, at no time signed the certificates or affixed the seal of the corporation thereto.

The only testimony as to the certificates and what happened to them came from Musall.[2] The reasons for the sending of the certificates are shrouded in conjecture. Musall testified that he did not know by whose authority the stock was sent. Promotora kept no books, at least until 1961. Musall "presumed that Mr. Hillis arranged it." Promotora had been conceived and established by Hillis, under power of attorney from Sterk, Musall and "possibly" Broun; as far as Musall knew, this was in accordance with Panamerican law. Musall understood that the stock sent to him represented a declaration or a distribution authorized by Promotora. He based this understanding upon previous conversations with Hillis and Sterk "in which this had been agreed upon, with the exception of Mr. Broun and then Mr. Sterk and myself giving Mr. Hillis power of attorney to act in our name as Promotora."

---

2. Musall's pre-trial deposition was offered in evidence and is set forth in the record. In summarizing the evidence, we do not distinguish between what he said in the deposition and his testimony at the trial, except as otherwise noted.

Musall further testified that he did not issue the stock because he wanted to keep Promotora in status quo in view of the litigation which was then pending in the Federal Court. In July 1960, Musall returned the certificates for the 6844 shares of Promotora stock to Panamerican unexecuted and undelivered.

On May 9, 1962, a suit was filed by Mrs. Hillis against her husband in the Circuit Court for Baltimore County. Through this suit, Broun learned for the first time of the certificates for 953 shares of Promotora stock which had been made out in his name and sent to Musall. Musall testified that he had made no effort to tell Broun of the stock in his name in January or April of 1960; that he sent the stock back in July, 1960 because of the contentions being made by Broun in his suit in the Federal Court and that the stock was held by him, Musall, "in safekeeping" pending a settlement. He testified further that in 1961 he talked to the attorney for Promotora, in Panama, who stated he knew nothing about the issuance of any stock. Musall had never discussed the January and April, 1960 transactions with Hillis. Musall stated in a pre-trial deposition that there was no consideration for the stock issued to him or Broun and that, to the best of his knowledge, it was a stock dividend.

The 953 shares of stock in Broun's name were returned to the Promotora treasury and were carried on Promotora's books as treasury stock at a cost of $10 a share. Musall did not know how this entry was put on Promotora's books. Musall's and Sterk's stocks were "held in safekeeping" by Promotora in Panama.

The Promotora statement for 1960 indicates that in connection with the 6844 shares some $156,800 was paid. There was testimony by a certified public accountant, on behalf of the Brouns, that the source of the $156,800 was Panamerican, and that this sum represented an asset of that company which did not appear on its balance sheets. This alleged asset was not disclosed to the Brouns prior to their settlement. Musall testified that he knew of no such amount having been paid into Promotora.

In 1962, stock in Promotora in the amounts of the original certificates was reissued to Sterk, Musall and to bearer (for Hillis) but not to Broun. Musall believes that Broun's 953

shares were treated as treasury stock or were nullified and voided.

Broun knew nothing of the transactions to which reference has been made until the suit was filed by Mrs. Hillis in May, 1961. He testified that if he had known of the Promotora shares in his name, he would not have settled the suit in the United State District Court for the amount he received.

### III

The Brouns filed the present suit against Promotora in the Circuit Court for Baltimore County on September 20, 1961. In their original declaration, in addition to the common counts, the Brouns alleged that the Promotora issuance of 953 shares of its common stock to them was for a consideration furnished by Panamerican and by its direction, that the said shares thereupon became the property of the Brouns, and that Promotora subsequently redeemed and re-acquired the said shares for $9530 which it owes to the Brouns. In another count, the Brouns alleged that Promotora issued stock dividends aggregating 6844 shares to Panamerican, its sole stockholder; that Panamerican directed said shares be issued in the names of and distributed to its common stockholders as dividends on their Panamerican common stock payable in stock of Promotora; that the plaintiffs, owning 18.2 per cent of Panamerican common stock, were entitled to 1245 shares out of the 6844 shares issued and that Promotora accordingly has withheld from the Brouns and owes to them the value of 1245 shares at $10 a share.

Panamerican, although a Maryland corporation with a duly authorized resident agent, was not joined as a party defendant. There was, however, an attachment on the claims against Panamerican as garnishee, with the necessary account and affidavit. Promotora had no resident agent or place of business in Maryland; it was never served and did not appear to defend the case. Panamerican as garnishee confessed assets consisting of an unmatured indebtedness due by it to Promotora in the amount of $40,000. Although Promotora did not become a party to the case, Panamerican as garnishee filed the general issue plea on behalf of Promotora, as it had the right to do under Maryland Rule G52 a. No bond was filed by the Brouns at any

stage of the proceedings. At the trial, the court permitted the Brouns, over Panamerican's objection, to amend their declaration, account and affidavit, by substituting $26 for $10 a share as the corrected value of the Promotora shares, and also permitted a change in the description of the issuance of the 6844 shares by Promotora from "stock dividends" to "stock."

Testimony was taken before Judge Turnbull. On May 15, 1964, the judge gave his oral opinion. He found as a fact that there was an agreement "that the Brouns should participate in Promotora to the same extent as they participated in Panamerican, to wit, eighteen point two per cent, which means that out of these shares which were issued, if they were indeed issued, they would be entitled to twelve hundred forty-five shares." He further found that "Mr. Hillis had powers of attorney from Mr. Sterk and Mr. Musall; that holding such powers of attorney he could act as a one-man board of directors in Panama; that it necessarily flows from the actions and conduct of the parties that he did act as a one-man board of directors and authorized the issuance of these two issues in January and April 1, 1960 as dividends, whether as stock dividends or dividends in kind makes, I think, little or no difference; that there remained only a ministerial act to be done, to wit, the signing by Mr. Musall and the affixing of the seal in order to complete the certificates. Being a ministerial act, in my opinion, Mr. and Mrs. Broun could have coerced him to act by way of mandamus, if he refused to act." Judge Turnbull held that the Brouns were entitled to 1245 shares. Because he found the Brouns had not satisfactorily established a price per share, he stated that the valuation should be $10 a share (the par value) and delivered a verdict in favor of the Brouns in the amount of $12,450. Judgment was entered in that amount in favor of the Brouns against Panamerican as garnishee. From that judgment both Panamerican and the Brouns have appealed.

## IV

Panamerican contends that the Brouns were not entitled to any recovery and that a verdict should have been entered in favor of the defendant. The Brouns contend that the verdict in their favor should be increased to $32,370, which would rep-

resent recovery for the 1245 shares alleged to be due them at the valuation of $26 a share.

In his opinion, Judge Turnbull did not refer to the effect upon this litigation of the release executed by the Brouns in settlement of the case in the federal court. The Brouns, as a threshhold contention, suggest that Maryland Rule 885 prevents the consideration by this Court of the effect of that release because, under the Rule, the Court "will not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court." The Brouns argue that the lower court properly did not pass upon the effect of the release because Panamerican as garnishee did not claim the Promotora stock for itself by virtue of the settlement as it could have done by a petition in the attachment suit or by a motion to quash under Maryland Rules G58 and G51. We do not agree.

The question of whether the Promotora stock belonged to the Brouns was presented to and decided by the lower court. Even though the stock were validly issued, if it did not belong to the Brouns, they had no legal claim against Promotora for its alleged conversion. The question of the effect of the release upon the claim of the Brouns, the record shows, was presented to and argued before the lower court. Even where a case may present two separate legal questions and the lower court decides one of the questions and deems it unnecessary to decide the other, we have held that this Court can decide both questions under the Rule. *Kent v. Mer.-Safe Dep. & Tr. Co.,* 225 Md. 590, 171 A. 2d 723 (1961). We hold that the effect of the April, 1960, sale and release is properly before us.

A number of issues have been ably briefed and argued by the parties. Panamerican contends that the attachment is invalid because the Brouns' claim was an *ex contractu* action for unliquidated damages and that a bond was essential under Maryland Rule G42 e; the Brouns answer that, under the authorities, the attachment was based on a liquidated claim. Panamerican contends that no shares of Promotora were ever validly authorized, issued or delivered to the Brouns; the Brouns' position is that, as the court below found, Hillis, acting as a one-man board of directors for Panamerican, authorized the issu-

ance and that there remained only a ministerial act to be done. Panamerican contends that to permit a recovery of the value of any portion of the 6844 Promotora shares, even if they were issued prior to the April 30, 1960 sale and settlement, is to give the Brouns an undeserved windfall, because, since Panamerican was the sole stockholder of Promotora, any issuance of Promotora stock to the Panamerican stockholders would necessarily reduce the value of the Panamerican stock to that extent. The Brouns answer that Panamerican had an undisclosed asset of $156,800; that the information they had when they entered into the sale and settlement was incomplete and misleading, and that, even if they recover what they now claim, they would not be unjustly enriched but, on the contrary, would still have a substantial unsatisfied claim. Other questions which have been argued include the proper evaluation for the Promotora stock and the source and purpose of the $156,800 which the Brouns claim was paid into the Promotora treasury in connection with the issuance of the shares.

We do not reach most of the questions presented, for, in our opinion, the case turns on a single issue. For the purpose of this decision, we assume, without deciding, that the 953 shares of Promotora stock were issued to the Brouns. We assume further, *arguendo,* that, if the transaction had been completed, the Brouns would have received a total of 1245 shares, which would have been the proportion of the 6844 shares representative of their former holdings of Panamerican common stock. In our judgment, these facts, if true, are immaterial, because, by virtue of the sale and the release which they had executed, the Brouns had no legal or equitable claim to any of the Promotora stock.

Admittedly, prior to the transactions in respect of the 6844 shares, the Brouns did not own any stock in Promotora and admittedly they paid no consideration for the issuance of any of its shares. The release of April 30, 1960 was given by the Brouns in consideration of the purchase price of $80,000 for their Panamerican stock and in settlement of the litigation instituted by them in the United States District Court. In that litigation, the Brouns claimed that the transfer of assets from Panamerican to Promotora was illegal and void. The relief prayed included the final determination of all matters of legal controversy and

the doing of substantial justice between the parties. The sale of their stock and the execution of the release, under the circumstances, operated and was meant to operate as a complete extinguishment of any claims of the Brouns to any rights they might have had by virtue of their ownership of the Panamerican shares. The release was of all claims, demands, and rights arising prior to its date.

The only plausible deduction from the record, in our opinion, is that the Promotora stock was purported to be issued as a step in carrying out the plan for the transfer of Panamerican assets to Promotora, to which Broun had objected, and to prevent which he brought his suit in the federal court. The fact that the Brouns, like the other Panamerican stockholders, were to receive the same proportion of the Promotora stock as their relative ownership of the Panamerican stock supports that interpretation. The relative stock control would have to be maintained as a necessary part of the entire plan. However, the issuance of the Promotora stock was meaningless without the transfer of Panamerican assets to it. The Panamerican stock which the Brouns sold in their settlement of their federal law suit had its share of the assets transferred to Promotora as a necessary appendage; otherwise, Panamerican would have been largely an empty shell. The Promotora stock claimed to be issued represented a step in the maturation of that appendage. It was the partition, as a whole, to which Broun objected, and when he and his wife sold their Panamerican stock (for almost twice what had been paid for it), the appendage, however inchoate, went with it. From the point of view of what was necessarily involved in the settlement, it is immaterial that Broun did not know the partition had begun; it was the whole transaction to which he had objected, and, in selling his stock and giving the release, he severed himself from his entire interest in the Panamerican-Promotora venture.

It is true, as the Brouns contend, that the general rule is that dividends and distributions declared and payable on stock prior to a sale thereof belong to the seller. Fletcher, *Cyclopedia Corporations,* § 5377 (Rev. Vol. 1958). See also *Miller v. Safe D. & T. Co.,* 127 Md. 610, 615, 96 Atl. 766 (1916) and cases therein cited, and *Real Estate Trust Co. v. Bird,* 90 Md. 229,

246 (1899). However, in this case, there was not only a sale but a general release, both of which were based upon the settlement of the controversy between the parties. The heart of that controversy was the formation of Promotora and the transfer to it of Panamerican assets, over Broun's protest.

A release is to be construed according to the intent of the parties and the object and purposes of the instrument. *Wheaton Lanes v. Rinaldi,* 236 Md. 525, 531, 204 A. 2d 537 (1964) ; *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 64, 141 Atl. 434 (1928). The purpose of the release in this case, in view of the nature of the litigation in the federal court and the controversy which led to it, was that in consideration of the sum of $80,000, which the Brouns received, they relinquished all rights of any kind which they had against Panamerican and the individual parties by reason of their former ownership of the Panamerican stock and any matters in connection therewith. For the reasons we have stated, any rights as to Promotora or its stock were included.

Broun contends that because information of the January and April, 1960 issuance of the Promotora shares was not disclosed to him, the sale and settlement were, in effect, fraudulent. He also contends that there were other misrepresentations or failure to disclose pertinent information prior to the settlement. The short answer to these contentions is that the Brouns have not sought and are not seeking a rescission of the sale and settlement. They can not attack the validity of that transaction without seeking to set it aside and tendering back the $80,000 which they received as a result thereof. See *Adamstown Canning Co. v. B. & O. R. R.,* 137 Md. 199, 208-209, 112 Atl. 286 (1920). See also, *Mortgage Corp. v. Debenture Corp.,* 178 Md. 658, 675, 16 A. 2d 866 (1940).

> *Judgment reversed and cause remanded for entry of judgment in favor of the appellant; costs to be paid by the appellees.*

*Per curiam* opinion on motion for rehearing and/or for revision of opinion follows at page 548 of 238 Md. *infra.*