SANITARY FACILITIES II, INC. *v.* JOHN J. BLUM ET UX., ET AL.

[No. 755, September Term, 1973.]

*Decided July 15, 1974.*

The cause was argued before ORTH, C. J., and MOORE, J., and HOWARD S. CHASANOW, Associate Judge of the District Court of Maryland for District 8, specially assigned.

*Eugene Hettleman* for appellant.

*John Henry Lewin, Jr.*, with whom were *Benjamin R. Civiletti* and *L. Vernon Miller, Jr.*, on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

Several purchasers of Levitt homes in the Rock Creek Estates, II subdivision of Anne Arundel County prevailed below on a motion for summary judgment in a class action to remove a cloud on title. The appellant, Sanitary Facilities

II, Inc., is a private corporation whose sole remaining asset, allegedly acquired under a "Deed and Agreement" dated April 5, 1968, is a purported right to collect water and sewer charges from the homeowners over a thirty year period which would produce, if collected, some $855,000. It did not construct or install the facilities or pay for their construction or obligate itself to do so. The corporation complains here that the Chancellor decided the motion for summary judgment erroneously and upon grounds neither advanced nor argued. Furthermore, it contends on appeal, as it did before the Chancellor, that appellant itself and not the appellees, is entitled to summary judgment. For the reasons stated below we affirm the decree.

I

Appellant (to which we will refer as "Sanitary") was one of several wholly owned corporations of Richard Swirnow, a developer. The property which is the subject of this controversy consisting of some 264 lots, was acquired (unsubdivided) on November 30, 1966 for $211,000 by Registered Realty, Inc. ("Registered") from Rock Creek Holding Company, both corporations being owned and controlled by Swirnow. On April 5, 1968 several conveyances and reconveyances of the property were made by and between Registered, Sanitary and Babs, Inc. ("Babs"), the latter being also a Swirnow corporation. On that date, Registered conveyed the land to Sanitary and Sanitary then reconveyed to Registered by a so-called "Deed and Agreement" subject to "Sanitary Facilities Charges" to be paid by the ultimate owners of the lots. Registered then conveyed to Babs, which was to develop the lots, with a warrant by Babs to install the water and sewer facilities described in the Deed and Agreement. The respective deeds were inscribed "No Stamps Required" and were executed by Swirnow as the president of the grantor corporations. (The Deed and Agreement was signed on behalf of Sanitary by Robert Warfield, Vice President, and by Swirnow as President of Registered Realty).

There then occurred a time lapse until the summer and

fall of 1970. In August of that year Babs entered into a contract with Cosle Contractors, Inc. to construct the water and sewer facilities for $324,609.00. In October of 1970, Levitt and Sons, Inc. appeared on the scene for the first time — not directly but through a wholly owned subsidiary, Windward Enterprises, Inc., which purchased the land from Babs by a sales agreement dated October 21, 1970 for $982,600. The obligations of the Cosle Construction Contract were assumed as part of the purchase price. The deed was executed by Swirnow as President of Babs. Paragraph four of the Agreement of Sale between Babs and Windward provided as follows:

> "*Sanitary Facilities Charges* — the parties understand that there has been imposed upon the Property certain obligations dealing with charges for water and sewer facilities. . . . Seller covenants and warrants that, at Buyer's request, Seller will cause all obligations . . . including, but not limited to, the lien of the sanitary facilities charges, to be released of record or waived in a manner satisfactory to counsel for Buyer on all lots contained in the Property."

Windward did not request and obtain release of the lien of the Sanitary Facilities Charges as above provided prior to settlement and its apparent inability to obtain it after the settlement has resulted in this litigation.

The water and sewer facilities were constructed and installed by Cosle and the entire cost was paid by Windward. Appellant, it is conceded, had nothing to do with the construction of the water and sewer facilities and paid no part of the costs.

Approximately one year later, on September 23, 1971, Windward conveyed the lots to Levitt. Scarcely two weeks thereafter, on October 6, 1971, Max Angus Bloom, as President of Sanitary filed among the Land Records of Anne Arundel County a so-called "Declaration" entitled "Schedule of Frontfoot Computations," which computed the charges on each of the lots. The total charges were $28,500 annually,

payable annually for thirty years. In March 1973, bills for the first annual assessment were mailed by Sanitary to the purchasers of the Levitt homes and on May 8, 1973 this action was instituted.

The bill of complaint sought a declaration that the Sanitary Facilities Charges constituted a cloud upon the plaintiffs' title and prayed for injunctive relief against their collection. The bill was accompanied by eleven exhibits together with a motion for summary judgment and a supporting memorandum. Sanitary's answer substantially admitted the factual allegations of the bill and the authenticity of the exhibits, contesting principally those allegations setting forth plaintiff-appellees' interpretations of and conclusions from the basic documents. In its answer and in its opposition to the summary judgment motion, defendant-appellant prayed the court to render a decree that the charges are valid and to provide for their enforcement.

The critical documents involved in this case are two — the Deed and Agreement between Sanitary and Registered dated April 5, 1968 and the Agreement of Sale between Babs and Windward dated October 21, 1970.

(a) *The Deed and Agreement*

This seven page document recites in several *whereas* clauses that "the developer" (Registered) intends after subdivision of the land to provide the lots with water and sewer pipes in the street, house connections and meters and to enter into an agreement with Anne Arundel County whereby the County would agree not to impose any connection charges and front foot benefit assessments, that the County would provide maintenance after construction and provide also the water to be supplied and used by the individual lot owners and paid for by them as used. The purpose of the Deed and Agreement was stated to be: ". . . *to make the covenant and agreement to pay the Sanitary Facilities Charges a covenant and agreement running with and binding upon each lot and upon present and future owners and occupants of the*

*same and each of their respective heirs, representatives, successors and assigns. . . ."* (Emphasis added.)

The specific covenants (the recited consideration therefor being $5) include *inter alia* the following agreements:

(1) Each of the lots shall be subject to the Deed and Agreement and annual Sanitary Facilities Charges "representing annual charges for the construction and installation of water and sewer pipes," and the latter shall constitute a "lien or encumbrance" on the land with respect to which such charges are made.

(2) The charges shall begin on January 1 of the second year following conveyance by Registered Realty of the individual lots and continue for thirty years, payable in advance on January 1 of each succeeding year.

(3) The charges shall be computed by multiplying $2.20 times the front footage of each individual lot in accordance with a recorded plat of the subdivision. After the recordation of the subdivision plat, Sanitary shall declare a "Schedule of Front Foot Computations" and "each grantee, it or their successors or assigns, shall be liable for the annual charge" so computed.

(4) All charges shall be payable to Sanitary, its successors and assigns, Sanitary being authorized to pledge, assign, hypothecate, mortgage or encumber the revenue.

(5) No sale, lease or transfer of the land or the lots subdivided therefrom shall be made otherwise than subject to the aforesaid *"covenants, agreements, restrictions,*

*conditions and charges,"* and the same *"shall run with and bind the land . . .* the Developer, its successors and assigns and the present and future owners of the land . . . and each of their respective personal representatives, executors, administrators, heirs, and assigns." (Emphasis added.)

(b) *Agreement of Sale between Babs and Windward* [1]

In this thirteen page agreement dated October 21, 1970 Windward agreed, *inter alia,* to reimburse Babs for the sum of $24,310.68 paid by Babs to Cosle Construction Company for the construction of water and sewer facilities and to assume the payment of Cosle's water and sewer installation contract in an amount warranted not to exceed $300,298.32. The full text of paragraph four of the agreement is as follows:

*"Sanitary Facilities Charges* — The parties understand that there has been imposed upon the Property certain obligations dealing with charges for water and sewer facilities, as more particularly set forth in a Deed and Agreement dated April 5, 1968, by and between Sanitary Facilities, II, Inc. and Registered Realty, Inc., which deed and agreement has been recorded among the Land Records of Anne Arundel County in Liber MSH 2160, folio 303, a copy of which is attached hereto, made a part hereof and marked 'Exhibit E'. Seller covenants and warrants that, at Buyer's request, Seller will cause all obligations imposed by the terms of Exhibit E, including, but not limited to, the lien of the sanitary facilities charges, to be released of record, or waived in a manner

---

1. This agreement covered not only the subdivided lots involved here but also an unsubdivided tract designed "Parcel A," not here relevant.

satisfactory to counsel for Buyer, on all lots contained in the Property."

Paragraph twelve of the agreement of sale, entitled "Termination," provided that if Windward defaulted, Babs' sole remedy was forfeiture of the deposit. Conversely, Windward's rights were stated as follows:

"In the event that Buyer terminates by reason of a right provided herein, or upon the breach by Seller of any warranty or representation contained herein, which breach is discovered by Buyer prior to Closing, all monies paid or deposited, whether in escrow or otherwise, shall be refunded to Buyer immediately, and upon the making of such refund, this Agreement shall terminate and neither party shall thereafter have any rights hereunder against the other."

As previously stated, for reasons not disclosed in the record before us, Windward did not obtain prior to closing the release or waiver of the Sanitary Facilities Charges in accordance with paragraph four above quoted nor in accordance with paragraph 8 (B) of the Agreement of Sale which provided for good title, "except for (i) the Sanitary Facilities Charges Deed and Agreement, unless prior to Closing Buyer has requested Seller to remove such charges as of the date of Closing. . . ." Swirnow in an affidavit in opposition to the appellees' motion for summary judgment made the following statement: "Had Windward made such a request, there would have been no settlement, and no further liability between the parties, as set forth in paragraph 12 [termination clause above quoted] of said Agreement."

The Swirnow affidavit contains the following additional affirmations pertaining to his version of the facts relating to the charges:

(1) He first decided "to arrange for the installation of certain water, sewer and storm drainage facilities rather than have them installed by

the County, which would thereafter bill the cost of the same to the individual lots over an extended period of time."

(2) Simultaneously, he also concluded it would be "economically feasible and desirable for his operation to impose on each lot, and retain after sale an *annuity*." (Emphasis added.)

(3) He caused the documents of April 5, 1968, *supra*, to be prepared and executed to accomplish this purpose and "to leave the right to collect the annuities in a separate company where it [sic] would not be a subject of merger, as a result of later conveyancing." Furthermore, since Swirnow "controlled all the corporate entities at that time, it was not material which of the companies which he then controlled held the right to collect the charges, and which was the developer, and which had the obligation for, or paid for the costs of installation . . . these were purely internal matters."

(4) Since April 5, 1968, "he has substantially disposed of his ownership in the Defendant corporation, Sanitary Facilities, II, Inc., and is no longer the substantial owner or controller thereof, nor is he an officer."

(5) He never represented to Windward or Levitt that he had the capacity or authority to release or waive the Sanitary Facilities Charges, nor did Windward request prior to closing that Babs remove the charges, as provided for in paragraph 8 (B).

## II

The Chancellor's memorandum opinion took note of the "lengthy and learned" memoranda which had been submitted by counsel, in connection with the motion for summary judgment, concerning the legal status and effect

of the Sanitary Facilities Charges. He found, however, "a quicker way to cut the knot" and held as follows:

"About the release of the charges, Swirnow says: 'Had Windward made such a request, there would have been no settlement.' Perhaps not. But, presumably, there would quickly have followed Windward's short, simple, and successful specific performance suit; that course still appears to be open. Since that has not occurred, the Plaintiffs have standing to require specific performance [citing cases]. Having that standing with relation to the Babs-Windward contract, they also have standing to seek a declaration of their rights under that contract.

"Paragraph 4 of the contract requires Babs to secure a release of record of the charges imposed by the Sanitary-Registered Deed and Agreement. Babs has not done so, though Swirnow's affidavit asserts that 'it was not material which of the companies which he then controlled held the right to collect the charges.' Swirnow then argues, by reference, that he had no power to secure the release. Though he does not say so, his alleged impotence must be supposed to arise from the fact that Babs and Sanitary are separate corporations.

"It is true that rarely will a court look behind a corporate veil. But a court of equity will do so without hesitation to prevent fraud or injustice [citing cases]. Failure to pierce the veils here and decree that Swirnow should perform, in a specific performance suit, would allow him to perpetrate a fraud upon the Plaintiffs. It follows that, since this is not a suit for specific performance, the Plaintiffs are entitled to a declaration that the 'Sanitary Facilities Charges' allegedly created by the 'Deed and Agreement' of 5 April 1968 are null and void."

While he thus avoided one thicket, we apprehend that he became entangled in another. The limitations on summary

judgment procedure under Rule 610 have been frequently stated by the Court of Appeals. A hearing on the motion is not a substitute for trial but to determine whether a trial is necessary. The purpose of the hearing is not to determine disputed facts but whether a genuine dispute as to any material fact exists. *Lipscomb v. Hess*, 255 Md. 109, 257 A. 2d 178 (1969). If facts are susceptible of more than one inference, the inferences must be drawn in the light most favorable to the person against whom the motion is made and in the light least favorable to the moving party. *Lawless v. Merrick*, 227 Md. 65, 175 A. 2d 27 (1961); *Howard Cleaners of Baltimore, Inc. v. Perman*, 227 Md. 291, 176 A. 2d 235 (1961); *Shaffer v. Lohr*, 264 Md. 397, 287 A. 2d 42 (1972).

In this case the narrow holding of the court was that Sanitary was bound by the commitment of Babs contained in paragraph four of the Agreement of Sale, *supra*, to cause the lien of the charges to be released of record or waived. Necessarily, this conclusion implied a determination of fact that as of the date of the Babs-Windward agreement of October 21, 1970, Swirnow was an officer of and exercised control over the appellant corporation. This finding is at variance with the averment in Swirnow's affidavit that he had substantially disposed of his ownership in Sanitary and was no longer the substantial owner or controller nor an officer. While it is true that the affidavit was dated June 14, 1973 and did not specifically relate to conditions as of October 1970, he also affirmed that he never represented to Windward that he had the capacity or power to effect a release or waiver of the charges. Furthermore, the affidavit was submitted in response to a motion for summary judgment which did not address itself to the question of whether there was potential fraud, as found by the Chancellor. The gravamen of the motion was that the charges were invalid as a matter of law. This was the sole question upon which issue was joined.

Under these circumstances, we think it was a misapplication of summary judgment procedure to "pierce the corporate veil," to find that specific performance at the suit of appellees would surely lie against Swirnow, Sanitary

Facilities and/or Babs — and would be successful — and that to hold otherwise would allow Swirnow to "perpetrate a fraud upon the plaintiffs."

However, this finding is not dispositive of the appeal. The question of the validity *vel non* of the Sanitary Facilities Charges having been presented by both sides to the court below, is properly before us for consideration. Rule 1085; *Panamerican Co. v. Brown*, 238 Md. 438, 209 A. 2d 575 (1965); *Kent v. Mercantile-Safe Deposit and Trust Company*, 225 Md. 590, 171 A. 2d 723 (1961). Moreover, as conceded by both sides, there is no genuine dispute of fact that precludes determination of the issue.

### III

Paragraph eight of the Deed and Agreement between Sanitary and Registered states in part:

". . . all the covenants, agreements, restrictions, conditions and charges herein contained *shall run with and bind the land, each and all the abovementioned lots to be sub-divided therefrom and premises and every part thereof. . . .*" (Emphasis added.)

The question, then, is whether these words succeed in what they purport to do, namely, impose "Sanitary Facilities Charges" upon the ultimate purchasers of the individual lots and their successors and assigns, who are not parties to the Deed and Agreement.

Appellant argues that charges on land conveyed "go back in the history of our law as far as the history itself." Conceding that it cannot point to a specific case presenting language and circumstances such as are involved here, appellant urges the Court to eschew labels and to acknowledge that "the theory of imposing charges upon land, for any variety of purposes or reasons, is well settled in the fabric of our law." This is indeed a bland and simplistic approach. We find it contrary to the admonition uttered long ago by Lord Chancellor Brougham in *Keppel v. Bailey*, 2 M. & K. 517:

"... it must not therefore be supposed that incidents of a novel kind can be devised and attached to property, at the fancy or caprice of any owner.... [G]reat detriment would arise, and much confusion of rights, if parties were allowed ... to impress upon their lands and tenements a peculiar character, which would follow them into all hands, however remote."

Moreover, we think it only fair that appellant be taken at its expressed intent. As has been seen from the documents summarized previously, it was appellant's intention that water and sewer facilities would be built by appellant or its affiliates rather than by Anne Arundel County, and, accordingly, appropriate charges would be imposed by appellant on the individual lots. The undertaking to construct the facilities was not assumed by Registered, appellant's immediate grantee. It was assumed by Babs, the subsequent grantee of Registered, but in October 1970 Windward reimbursed Babs for the money it had expended in the construction of water and sewer facilities up to that time and Windward also, as part of the purchase price of the lots, assumed the obligations of Babs under its contract with Cosle in a sum exceeding $300,000. Thus, neither appellant nor any of its affiliated companies paid any of the cost.

In the context of these facts and circumstances, appellant attempts to put aside the contentions made by the appellees before the Chancellor and here, that the Sanitary Facilities Charges are not covenants running with the land nor any species of enforceable equitable encumbrance. Its naked position is that the charges can be termed an "annuity" and if that not be sustained, then we should apply the rationale of *Newbold v. Peabody Heights Co.*, 70 Md. 493, 17 A. 372 (1889).

We take a different view. First, we recognize no such liberality in the imposition of charges upon real property. We are bound by well settled principles of law concerning covenants running with the land and equitable servitudes and we perceive, fundamentally, that a covenant or condition or burden does not attach to land conveyed merely

by virtue of the words employed by the conveyancer. *Glenn v. Canby,* 24 Md. 127 (1886).

In Tiffany, *Real Property* (3rd ed.), § 854, it is said (p. 455):

"An important test for distinguishing a real or running covenant from a merely personal or collateral one, is whether or not the covenant so closely relates to the land or estate granted or its use, occupation or enjoyment, that it may be said to 'touch and concern' it. If the covenant, or its observance or breach, is thus related to the land, its burden or benefit passes with the ownership of the land; if it is not so related it will not accompany a transfer of ownership."

Here, Registered received a conveyance of the property in fee simple. Nothing it or Sanitary was required to do, or refrain from doing, by the Deed and Agreement either benefitted or burdened its use, occupation or enjoyment of the estate except collaterally, by virtue of its contractual obligation[2] to subject *subsequent* grantees to the charges. Tiffany goes on to say:

"Ordinarily . . . a covenant is regarded as touching and concerning the land if it is of value to the covenantee by reason of his occupation of the land or by reason of an easement which he has in the land, or *if it is a burden on the covenantor by reason of his occupation of the land.*" (Emphasis added.)

Clearly the Sanitary Facilities Charges were of no value to Sanitary by reason of Registered's *occupation of the land* since the charges were payable only after Registered's occupancy had terminated. In *Glenn v. Canby, supra,* the Court of Appeals found the connection between real

---

2. Paragraph 8 of the Deed and Agreement between Sanitary and Registered provided: "No sale, lease, mortgage, disposition or transfer of the aforesaid parcel of ground or lots sub-divided therefrom shall be made or operate otherwise than subject to the aforesaid covenants, agreements, restrictions, conditions and charges. . . ."

property and a covenant to pay off a mortgage secured by the property too tenuous to create a covenant running with the land. Here, no connection whatever existed, "independent of collateral circumstances" (Tiffany, *supra*), between the estate of Registered and the obligation to pay the Sanitary Facilities Charges.

It is to be noted that the charges are not imposed on the estate granted *Registered*, for, as recited in paragraph four of the Deed and Agreement, "The Sanitary Facilities Charges shall commence January 1 of the second year *following* conveyance by the Developer [,] its successors or assigns as to each lot conveyed for the construction of a dwelling unit thereon. . . ." Nor does either of the parties bind itself by the Deed and Agreement actually to construct the facilities for the cost of which the Charges purport to represent annual assessments, or to enter into any agreement with third parties for their construction. In point of fact the entire obligation imposed on Registered with respect to the charges is contained in paragraph eight, *supra* (n.2) of the Deed and Agreement wherein Registered agreed not to alienate the property except as subject to, *inter alia,* the charges.

It would be difficult to conceive of a covenant more "personal" in nature and therefore less capable of "running with and binding the land" than this agreement by Registered to do nothing with respect to the use or enjoyment of the property but only to establish facilities charges affecting remote grantees.

Under the ancient principle enunciated in *Tulk v. Moxhay,* 2 Phill. 774, cited by the Court of Appeals in *Lynn v. Mount Savage Iron Co.,* 34 Md. 603 (1871), a court of equity may under appropriate circumstances enforce limitations on use against remote grantees. In *Lynn* the Court said:

> "In such case, the question would be, not whether the covenant ran with the land, but whether the party should be allowed to use and appropriate the land in a manner wholly at variance with the contract entered into by its assignor, and with notice of which it purchased."

In *Tulk v. Moxhay* the owner of certain houses sold the adjoining land with a covenant from the purchaser not to sell or use it for any purpose than as a garden. In giving effect to the covenant against a remote grantee Lord Chancellor Cottenham reasoned:

"Of course, the price would be affected by the covenant, and nothing could be more inequitable than that the original purchaser should be able to sell the property the next day for a greater price, in consideration of the assignee being allowed to escape from the liability which he had himself undertaken. That the question does not depend upon whether the covenant runs with the land, is evident from this, that if there was a mere agreement and no covenant, this Court would enforce it against a party purchasing with notice of it; *for if an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased.*" (Emphasis added.)

Where, however, the obligation sought to be enforced is not for the benefit of land *retained* by the original grantor, Tiffany, *supra*, § 864, and where, particularly, the grantee has himself undertaken no liability respecting the land but merely agreed to impose a charge on subsequent grantees, the doctrine is inapplicable; there being no equity attached to the grantee's estate, there is none to preserve. Here, there was no covenant to pay the Sanitary Facilities Charges which appellant could have enforced against Registered and hence no pre-existing equity attached to the fee simple estate conveyed.

Equity has, it is true, applied the theory of an equitable lien upon property in order to avoid unjust enrichment. Burby, *Handbook of the Law of Real Property* (3rd ed.) p. 108. As appellees correctly point out, however, an equitable lien is necessarily dependent on the existence of a debt, constituting a charge on the thing as security for a debt or obligation. *See Westinghouse Electric Corp. v. State Tax Commission*, 206 Md. 392, 111 A. 2d 661 (1955). Here,

however, the Sanitary Facilities Charges are the sole existing "debt," contractual or quasi-contractual. To grace them with the title of an equitable charge or lien would be to permit an unconscionable form of bootstrapping. The truth is that neither appellant nor any of its affiliated companies suffered any detriment corresponding to the benefit they seek to exact from appellees.

Similar considerations dispose of appellant's contention that the charges can be termed an annuity, which it defines, quoting C.J.S., "Annuities," as a "fixed sum, granted or bequeathed, payable periodically, but not necessarily annually; and it may be made a charge on real estate as well as on the person if that is the intention of the parties or if the result follows by operation of law." [3] (Curiously, although a number of terms are employed in the Deed and Agreement, including "covenants," "restrictions," "conditions," "charges" and "liens," the word "annuity" does not appear.)

In support of the analogy appellant cites "an unbroken line" of Maryland cases upholding a charge upon land in the form of a requirement for support of (variously) a wife, daughters, an insane person attached by a testator to a devise. We find inapposite these testamentary cases, all involving, in effect, reservation of a part of the homestead character of the estate devised. Their rationale was set forth in *Donnelly v. Edelen,* 40 Md. 117, 121 (1874), as follows:

> "The will of the father provides, not only a home for his daughters, during their single lives, on the farm devised to the son, but for a reasonable and moderate support therefrom; and the devise to the son being subject to the condition of furnishing such home and reasonable support, that condition or proviso constitutes a charge on the farm. *The*

---

**3.** Where the word "annuity" is used in any of the cases upon which appellant relies, *e.g.* Willett v. Carroll, 13 Md. 459 (1859), the term is employed loosely and not in the strict, common law acceptation. An annuity was a yearly payment of a certain sum of money granted to another in fee, for life or for years, and charging the person of the grantor only. *Blackstone's Commentaries,* Book II, 40 (Lewis ed. 1902).

*defendant, as purchaser, can stand in no better position in reference to this charge than the son, the devisee, and as the right was enforceable against the farm while in the hands of the son, so it may be enforced against it in the hands of the defendant, the purchaser. . . ."* (Emphasis added.)

Finally, appellant's alternative reliance upon *Newbold v. Peabody Heights Co., supra,* is also misplaced. There, the Court of Appeals held that when a former vendor or lessor has imposed an easement, charge or restriction in the manner of its *use,* such as would be enforced by a court of equity as against his vendee or lessee, the party purchasing the land with notice will take it subject to such encumbrance, however created. The prior owner, Holmes, had imposed conditions and restrictions concerning the character, location and uses of buildings to be erected. Alvey, C. J. writing for the Court stated:

"The interest in Holmes for imposing the restrictions and conditions specified in the memorandum are very apparent. He reserved to himself and for his own use, as the site for a residence, a block or square of the parcel of land owned by him, all of which, except the square reserved, was embraced in the lease. He manifestly intended his own property to be benefited by the restrictions imposed upon that leased to the company; and, as we have seen, those restrictions are of a character that will be enforced by a court of equity."

In sum, we find no theory in law or equity upon which to enforce the Sanitary Facilities Charges against appellant's remote grantees absent their contractual agreement to assume them.

*Judgment affirmed; costs to be paid by appellant.*