691 A.2d 750

SEA WATCH STORES LIMITED LIABILITY COMPANY et al.

v.

The COUNCIL OF UNIT OWNERS OF
SEA WATCH CONDOMINIUM

No. 1121, Sept.Term, 1996.

Court of Special Appeals of Maryland.

April 1, 1997.

**6**

8

Mary T. Keating, Baltimore, for appellants.

Lee H. Ogburn (Kevin F. Arthur and Kramon & Graham, P.A., on the brief), Baltimore, for appellee.

Argued before CATHELL, HARRELL and THIEME, JJ.

CATHELL, Judge.

Sea Watch Stores Limited Liability Company (Sea Watch Stores) and the Club at Sea Watch, Ltd. (the Club at Sea Watch LTD appears to be a managing entity for the Sea Watch Stores) appeal from a judgment rendered against them granting injunctive relief in favor of The Council of Unit Owners of Sea Watch Condominium (Council of Unit Owners) by the Circuit Court for Worcester County (Eschenburg, J., presiding). Appellants present five questions:

 1. Should the Council have been permitted to avail itself of the judicial system before it complied with the dispute settlement mechanism mandated by the Maryland Condominium Act?

 2. Did the lower court err in ruling that the Council may impose rules for a condominium by means of restrictive covenants without compliance with the Declaration, the by-

laws of the condominium, and the Maryland Condominium Act?

3. Did the lower court err in failing to hold the Council to a standard of reasonableness in its enforcement of restrictions regulating the use by a small minority of owners of the general common elements, where such restrictions were not provided for in the Declaration, Bylaws, and in particular err in finding that the Council's actions were reasonable in:

(A) refusing to approve the opening of a doorway between two units, where the Appellants provided an engineer's certificate of safety?

(B) refusing to approve signs advertising the services?

(C) insisting that Appellants' game room needed a special exception for an arcade, where the city zoning administrator testified that no such license was required or available? And

(D) otherwise attempting to impose unreasonable restrictions on the operation of Appellants' stores?

4. Did the lower court err in holding that the name of a condominium complex constitutes a service mark which the Appellants misappropriated by using it in their corporate names and businesses?

5. Did the lower court err in awarding attorneys' fees to the Council?

We shall answer question one in the affirmative, and questions two, three, four, and five in the negative. We shall affirm Judge Eschenburg's well reasoned decision.

## Preliminary Discussion

■ In order to comprehend fully the present dispute, certain precepts of the law of real property generally and of condominiums specifically must be examined. We shall first address the nature of a condominium.[1] It is a subdivision of

---

1. "Horizontal Property Regime," as used in the original act, 1963 Md. Laws, Chap. 387, was a misnomer. A condominium is actually a

land as land is defined to include all of its constituent elements, including the airspace above the physical land. A condominium is no less a subdivision in real property terms than a subdivision of physical ground that extends, not vertically, but horizontally. To conceptualize that a condominium is a subdivision, one needs to visualize that if the vertical building comprised of individual condominium units were to be laid horizontally on the ground, the condominium would then be a subdivision of that ground.[2] All a condominium is, is a vertical, rather than a horizontal, subdivision of one of the incidents of real property, the airspace.

One must always remember that the condominium statutes did not create new real property. They simply created another way to own airspace[3] and to regulate the use of that incident of real property that had always been a part of real property.[4] Judge Eschenburg anticipated the focus of our

---

vertical property regime composed of horizontal slices of the airspace (airspace has always been an incident, i.e., part, of real property) within the vertical column. These horizontal airspaces constitute the individual units.

2. When the building is constructed so that it retains two or more banks of units separated by hallways, the units would be laid out horizontally in opposing directions. The concept, of course, is more difficult when the vertical structure is round, triangular, or terraced, but the general concept of a subdivision of real property remains.

3. Even when a condominium regime is comprised of single story or townhouse style units, the individual units are still horizontal slices of the vertical airspace column above the ground, although there may be no other units above or below them. Interestingly, questions remain as to whether the owners of the common elements, or the original developer under a reservation, would be able, in the absence of prohibitory language in the relevant documents, to add new units above existing units, as each unit's upper boundary is generally the underside of the roof or ceiling above the unit. In fact, the original developers of this condominium reserved unto themselves the right, for a period of time, to develop further the airspace above the parking garage. Absent a statute to the contrary, there is no reason to suggest that the concept of an expanding (*i.e.*, future phased) condominium would not be applicable to expanding development into vertical, as well as horizontal space.

4. Airspace, as well as subsurface space, has always been a part of the incidents of real property, subject, in most instances, to alienability.

discussion on the susceptibility of condominium units to encumbrances that can be imposed generally on any real property when he stated in his thoughtful opinion:

> [Appellee] was the record owner of the eight store units and entered into a Deed, Agreement, and Declaration[5] of Covenants, Restrictions, Charges, and Liens, which contains the Restrictions. The Court finds that these Restrictions amount to restrictive covenants running with the land. In order to be valid and enforceable, restrictive covenants may not be unreasonable, nor may they be against public policy. *Eisenstadt v. Barron*, 252 Md. 358, 250 A.2d 85 (1969).

---

One of the major land use/takings cases is *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which involved the question of whether a constitutional taking had occurred when regulations limited or forbade the owner of air rights above Grand Central Station in New York from building a high rise over the train station. Maryland courts have also recognized that airspace is part of real property. The Court noted in *Friendship Cemetery v. Baltimore*, 197 Md. 610, 621–22, 81 A.2d 57 (1951), "It is true if a landowner is to have full enjoyment of his land, he must have exclusive control of the immediate reaches of the enveloping atmosphere.... The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land." The Court of Appeals held that the airport was not interfering with the use of that property. (In some respects, the inhabitants of the cemetery with hopes of heaven might (were they able) consider that opinion to have concluded on a pessimistic note.) In *Macht v. Department of Assessments*, 266 Md. 602, 296 A.2d 162 (1972), a lease of airspace was valued for assessment purposes. There, the Court cited an Attorney General's opinion that it understood to be the law. That Attorney General's opinion held that airspace was "an 'independent unit of real property'.... It appears that ... airspace [can] be conveyed, leased, subdivided, and have interests created in it, and estates carved out of it in the same manner as land." *Id.* at 613, 296 A.2d 162 (citation omitted). This basic characterization of airspace as real property is at the core of the condominium concept.

5. Most condominiums, including the one at issue here, are created by documents that include the word "Declaration." In this case, there are two declarations—the one contained in the separate deed mentioned *infra* and the one contained in the condominium documents, *i.e.*, the Declaration and Bylaws. Hereafter, when we mean to refer to the declaration contained in the condominium documents, we will refer specifically to it as the Condominium Declaration or it will be clear from the context that we are discussing the Condominium Declaration.

■ *Eisenstadt* did not concern a condominium. It concerned restrictions on a lot within a subdivision. Accordingly, Judge Eschenburg was resolving the issues in this case according to the general law applicable to the placement of restrictions on the use of real property. He was completely correct in doing so. We hold, as Judge Eschenburg essentially found, that both the general law as to the use of real property and the law regulating condominiums apply when one is dealing with the uses to which horizontal slices of a vertical column of real property, *i.e.*, a condominium unit, may be subjected. Unless the statute provides to the contrary, when a condominium unit is encumbered by restrictions contained in the governing documents and by restrictions contained in that unit's chain of title, all reasonable restrictions, *i.e.*, the most restrictive provision, will generally apply.

In the case *sub judice*, a prior owner in the chain of title to the real property at issue "as a part of that general plan" of development of the eight commercial units caused to be recorded a declaration that contained restrictions by conveying the property to a subsequent owner in the chain of title by a deed containing that declaration of restrictions. As Judge Eschenburg found, this is one way in which restrictions may be imposed on the use of real property.[6] That deed (recorded among the Land Records of Worcester County at Liber 564, folio 416 *et seq.* in 1976) for the most part contains the restrictions and conditions appellants were alleged to have violated. The deed conveyed, and restricts, the use of store units 1, 2, 3, 4, 5, 6, 7, and 8, apparently comprising commercial units in the Sea Watch Condominium in Ocean City, a primarily residential complex. The store units were conveyed to 11500 Ocean Highway Limited Partnership, also described

---

**6.** *Sanitary Facilities II, Inc. v. Blum,* 22 Md.App. 90, 322 A.2d 228 (1974), proffered by appellants, did not involve restrictions, but instead an equitable servitude, *i.e.*, a promise to impose future charges. It is factually distinct and clearly inapposite. Moreover, even if appellants were correct, which we hold they were not, the deed restrictions imposed here were imposed as part of a general plan of development of the commercial units.

in the deed as "Declarant."[7] The deed notes that the "Declarant" intended to "take title to the Store Units" and thereafter to sell them "under a general plan of development."[8]

This deed provides that *both* the named "Declarant" (the grantee), and the owner, the Council of Unit Owners of Sea Watch Condominium (the grantor), wished to create "certain rights and obligations regarding the maintenance and operation of the Store Units."[9] It states that both parties chose to accomplish their desires by subjecting "the Store Units to certain covenants, charges, restrictions, and liens as hereinafter set forth" to be "collectively referred to as the 'Restrictions.' " The deed also notes that the restrictions were for the benefit of the "Store Units, all other Condominium Units within Sea Watch Condominium and the Council." The Council of Unit Owners was expressly delegated enforcement responsibility.

The actual granting clause states: "The Council does hereby grant, convey and assign unto the Declarant the Store Units, subject, however, to, and burdened, benefited and bound by, the Restrictions." (Emphasis added.) The habendum clause provides that the "Declarant" (the grantee), its successors and assigns, would have and hold the store units, forever, in fee simple "subject, however, to the" restrictions.

---

7. Generally, a grantor that establishes or joins in the creation of a declaration of restrictions is a declarant. In this instrument, the grantee is also described as a "Declarant." It is the grantor's declaration that, at the time of inception, bound the grantee. Once any of the store units were reconveyed by the grantee, those units were bound by the declaration of both the grantor and grantee. The deed in the case *sub judice,* as we have noted, was executed by both the grantor and the grantee. When we use the term "deed" in our opinion, we are referring to this deed unless we, or the context, indicate otherwise.

8. This refers solely to the eight commercial units being further developed after the condominium itself was established.

9. While the record does not explain the facts surrounding the acquisition of the units by the "Council," we surmise that the title to the units may have devolved to the Council from the developer, either at the time of the original creation of the condominium or shortly thereafter.

The habendum clause, moreover, stated explicitly, in reference to the restrictions, that the restrictions were

> hereby covenanted and agreed shall be binding upon the Declarant [the grantee], its successors and assigns, and the Store Units and each of them, to the end that the Restrictions shall run with, bind, benefit and burden the Store Units and each of them for and during the period of time specified hereafter.

Thereafter, the grantor and grantee specified the duration of the restrictions:

> All Restrictions ... shall be deemed covenants running with the land or charges and liens upon the land, or both, and any and every conveyance of any Store Unit shall be absolutely subject to the Restrictions whether or not it shall be so expressed in the deed.... The Restrictions ... shall continue in full force and effect ... until the 31st day of December in the year 2015, and thereafter shall be automatically extended ... for successive periods of ten years.

We shall, as did Judge Eschenburg, construe the restrictions at issue in this case as we would review any restrictive covenant imposed on real property. We acknowledge that the condominium documents may contain provisions that conflict with these deed restrictions. There may also be zoning restrictions in conflict. The conflicts between reasonable restrictions are, so long as a conflict does not create an impossible situation in regard to use, resolved, as they generally always have been, by applying the reasonable provision that most restricts the use.

### The Facts

The complaint in the instant case establishes the creation of the condominium through the execution and recording of the pertinent documents and discusses the powers of the board of directors and provisions of the condominium bylaws. It then discusses the conveyance of the eight store units at issue in the case at bar by the deed, which we have mentioned, from the Council of Unit Owners, as the owner of the stores, to

11500 Ocean Highway Limited Partnership. The complaint notes that the conveyance to 11500 Ocean Highway Limited Partnership was subject to certain restrictions intended to run with the land as a part of a general plan of development of the eight stores.[10] The various relevant restrictions are set out in the complaint, and a copy of the deed in which they were established is attached to the complaint and incorporated therein by reference. Appellee, the plaintiff below, then listed in the complaint the provisions it alleges were violated and that it sought to enforce, referring to both the restrictions contained in the direct chain of title (the deed) to the store units and in one instance to the covenants and restrictions contained in the Condominium Declaration and Bylaws. The complaint alleges the following violations:

A. Permitting, causing, and encouraging deliveries to the store units through the front entrances.

B. Permitting, causing, and encouraging customer access to the store units through the rear entrances.

C. Permitting, causing, and encouraging the store units to remain open after 11:00 p.m. by *inter alia* removing the doors.

D. Causing objects to be placed in the common elements (including chairs, and rubbish and debris), and disparaging the title of [appellee] to the common elements located in the area immediately adjacent to the store units.

E. Causing noxious odors or offensive activity and annoying unit owners and interfering with their peaceful use and possession by cooking and allowing objectionable odors to emanate from a store unit.

F. Conducting unlawful activity by operating a public arcade in the so called "kids center" and "hangout" in

---

10. The general plan of development of the eight stores contemplated that the stores could be individually owned. If that had occurred (and it is not entirely clear as to whether one of the stores is in other ownership) then the restrictions could have been used by the owners of one store to insure that an owner of another complied with the general plan.

violation of the Town of Ocean City zoning laws, and by performing unlawful renovations in violation of the Town of Ocean City zoning laws.

G. Placing signs upon the store units in violation of sign requirements and without Board of Directors['] approval.

H. Challenging [appellee's] right to administer, manage, and regulate the condominium and the use of its common elements by failing and refusing to abide by the require- ments applicable to the operation of store units and by threatening to appropriate the general common elements to [appellants'] sole use for its customers (*e.g.*, use for storage, customer access, store promotion, and recreation areas set aside for customers).[ 11]

The complaint substantially tracked the restrictions con- tained in the deed that created special restrictions, above and beyond the restrictions contained in the Condominium Decla- ration and Bylaws, as to the eight store units.

In reference to paragraphs A and B aforesaid, the deed provides:

### 1. *Deliveries*

(a) All deliveries of any kind to Store Units (including deliveries of inventory and supplies) shall be made through the rear entrances to those Units. No deliveries shall be made through the front entrances to Store Units. For purposes of this Deed and Declaration the "front entrances" of Store Units 1, 2, 3 and 4 shall be the entrance at the north side of each of those Units, and the "rear entrance" to those Units shall be the entrance at the south side thereof. The "front entrance" of Store Units 5, 6, 7 and 8 shall be the entrance at the south side of each of those Units, and the "rear entrance" to those Units shall be the entrance at the north side thereof.

---

11. Appellee also claimed a trademark "type" interference with the use of the name Sea Watch. We will address this issue *infra.*

(b) All deliveries to Store Units shall be subject to general direction and control by the Board of Directors of the Council or its duly authorized employees or representatives, provided such direction and control is exercised in a reasonable manner. Delivery vehicles shall be permitted to use the common elements of Sea Watch Condominium only to the extent that such use does not, in the reasonable judgment of the Board of Directors of the Council, interfere with the normal use of those common elements by the occupants of residential Condominium Units or with the normal traffic through them by sanitation, utility or other vehicles providing services to the Condominium.

### 2. *Customers*

(a) Customer access to Store Units shall be afforded only through the front entrances to whose Units, and rear entrances to Store Units shall not be used to provide customer access.

As to paragraph C of the complaint, the deed containing the restrictions provides:

4. *Hours of Operation.* Store Units may not be open for business or for deliveries prior to 7:00 a.m. or after 11:00 p.m. without the prior written approval of the Board of Directors of the Council.

As to paragraphs D and E of the complaint, the deed provides:

### 7. *Use of Store Units*

(a) No rubbish or debris of any kind shall be placed or permitted to accumulate upon or adjacent to any Store Unit, so as to render such Unit or any portion thereof unsanitary, unsightly, offensive, or detrimental to any of the other Units of Sea Watch Condominium, or to the occupants thereof, and the Owner of each Store Unit shall, at its expense, maintain its Unit in a clean, orderly and sanitary condition, free of insects, rodents, vermin and other pests. No objec-

tionable odors shall be permitted to arise from any Store Unit or portion thereof.

As to paragraph F, the deed states:

(b) All Store Units shall be operated in compliance with all current and future building, zoning, occupancy and other applicable laws.

As to paragraph G, the deed restrictions provide:

8. *Signs.* The Owner of each Store Unit may erect and maintain on the exterior thereof an appropriate sign (as determined by the Board of Directors of the Council, in its discretion) indicating the nature of such Unit's use and identifying the establishment located therein. Except as permitted by the preceding sentence, no signs may be erected or placed on or within any Store Unit closer than five feet from the front or rear boundary thereof without the prior written approval of the Board of Directors of the Council.

As to paragraph H, several provisions of the deed restrictions recite:

(b) Guests, invitees, licensees, tenants and customers of Store Units may use the general common elements of Sea Watch Condominium only for purposes of ingress and egress to and from those Units. Without limiting the generality of the preceding sentence, no such guests, invitees, licensees, tenants, or customers, as such, shall be permitted to loiter in the common areas of Sea Watch Condominium, nor shall they be permitted to use the common element bathrooms, or the common element game rooms, swimming pools, tennis courts, or other recreational facilities of the Condominium.

(c) Neither the Owners of Store Units nor their tenants, guests, invitees, licensees or customers shall place or cause to be placed or stored within the common elements of Sea Watch Condominium any furniture, packages, or objects of any kind without the prior written approval of the Board of Directors of the Council.

■ We shall first further address the applicability of the deed's restrictions to the subject property. Although appellants apparently do not understand that a condominium regime is real property and, thus, subject to the laws that generally apply to deed-imposed restrictions in the chain of title, Judge Eschenburg was fully conversant with the applicable legal standards. He initially opined: "As a threshold matter, the Court finds that the [deed] Restrictions are valid and enforceable.... [T]hese Restrictions amount to restrictive covenants running with the land." He then noted the applicable law:

> [R]estrictive covenants may not be unreasonable, nor may they be against public policy.... [R]estrictive covenants must "touch and concern" the land,[12] the original parties must have intended that the restrictive covenant run with the land, there must be privity of estate, and the restrictive covenant must be in writing. [Citation omitted.]

He then appropriately made specific findings as to the deed restrictions:

> In this case, the restrictive covenants do touch and concern the land. The performance of the covenant, the application of the Restrictions, necessarily rendered the [appellee's] interest in the land less valuable at the time of the covenant because the Restrictions serve to limit the uses to which the land could be put. Second, the language of the Restrictions clearly states that the parties intended the covenants to run with the land. Restrictions, Background, Para. (d) (The 1976 Deed purported "to cause the covenants, restrictions, charges and liens hereinafter set forth to run with, burden and benefit the [store units], and each of them"). Third, the parties to the 1976 Deed were in privity and, finally, the agreement was memorialized in writing.

---

12. Judge Eschenburg uses the term "land" generically throughout his opinion. He is not referring to land in terms of the ground level but as to all levels of real property, which would include the subsurface, the ground, and the airspace.

[Appellants] point out no public policy that is offended by the Restrictions. The Restrictions are not illegal. The Restrictions are clearly intended and designed to limit the use of the store units to ensure that the use of the residential units and the common areas is not unduly disturbed. [Citation omitted.]

The trial judge then noted that appellants were attacking the applicability of the deed restrictions by claiming that the restrictions violated "the principles of self governance" of the condominium and that the restrictions amounted to an ultra vires taking by appellee of the general common elements.

We shall digress for a moment to discuss a case that, if applicable, would be helpful to appellants in respect to their argument below and on appeal, that the Council of Unit Owners' actions were *ultra vires*. In *Ridgely Condominium Ass'n v. Smyrnioudis,* 105 Md.App. 404, 660 A.2d 942 (1995), the condominium association's Board of Directors adopted a resolution that prohibited clients of the commercial units from utilizing the condominium's lobby. The association later adopted, by less than a unanimous vote, a bylaw amendment that tracked the language of the resolution. We said, in a footnote, that under the condominium documents, the denial of all use of common elements to a unit owner by the governing body constituted an "ultra vires taking of a portion of their percentage interest in the common areas in derogation of the ... declaration as well as certain provisions of the ... Act." *Id.* at 409 n. 2, 660 A.2d 942. We did not, however, base our decision on that argument because it had not been raised. The Court of Appeals, in its review of *Ridgely,* 343 Md. 357, 365, 681 A.2d 494 (1996), noted that we had declined to base our decision on that theory. *See Id.* at 365, 681 A.2d 494. It then noted that at oral argument before it, the issue had been presented and noted the contention that the bylaw provision adopted had violated both the condominium declaration and statute by " 'taking' a property right. Such changes ... they maintained, may only be accomplished by ... the unanimous consent of the unit owners." *Id.* at 366, 681 A.2d 494. The Court of Appeals then decided to address the issue that we

had declined to resolve. The Court noted that the bylaw restriction adopted by amendment forbade the commercial unit owners from accessing their units through general common element areas. After a discussion of numerous foreign cases stating that in order to prohibit all use of a general common element by a particular unit owner bylaw amendments had to be passed unanimously, because a conversion of the general common elements to exclusive use of one owner constituted a taking of other owners' property without authority, *id.* at 367, 681 A.2d 494 (citing *Kaplan v. Boudreaux*, 410 Mass. 435, 573 N.E.2d 495 (1991); *Makeever v. Lyle*, 125 Ariz. 384, 609 P.2d 1084, 1089 (App.1980)), the Court of Appeals concluded:

> . Here, the rule at issue affected an "interest" in property. The bylaw amendment revoked the commercial unit owners' right to have their clients use the lobby. That right resembles an easement, which is an interest in property.... Since the right resembles an easement, we hold that the bylaw amendment affected an interest in the appellees' property.[13]

*Ridgely*, 343 Md. at 369–70, 681 A.2d 494 (emphasis added). After mentioning the "exclusive use" foreign cases it had previously discussed, which held that the granting of exclusive use of any general common element to one owner or a group of unit owners constituted a forbidden change in the ownership of those excluded, the Court noted that in respect to Ridgely Condominium:

> [T]he bylaw amendment disparately affected a portion of the unit owners by revoking a property interest they ac-

---

13. Not only is it similar to an easement, each unit owner actually owns an undivided percentage interest in the general common elements. They not only have easement rights, they are, in fact, owners. While not commonplace, it was not unusual, nor as far as we know prohibited now, for there to be multiple owners of a single item of real property, whether in a condominium or not. Some conveyances of land in the Ocean City area, where the subject property is located, have 1/64th interests conveyed to different owners. The condominium statutes provide a method to formalize the process in respect to condominiums.

quired when they purchased their units, without affecting the rights of the other unit owners.

... Further, under § 11–106(a), "[e]ach unit in a condominium has all of the incidents of real property." ... [T]he Association has attempted to reduce the "easement"... and that "easement" is one of the incidents of the ownership of a ... unit.

*Id.* at 370–71, 681 A.2d 494. The Court concluded:

By by-law amendment, the Association has attempted to deny that mutuality of use of a general comment element ...

[W]e hold that it was beyond the power of the Association by by-law amendment to purport to deprive the owners ... of their rights under the declaration and under the Maryland Condominium Act to the enjoyment of the lobby....

*Id.*

*We cite to the Ridgely* cases to emphasize that less than all unit owners may not arbitrarily and unilaterally amend bylaws that take away any of the incidents or rights in real property that existed when the condominium was created and to contrast that rule of law with the private deed restrictions separately created in the case at bar. When one by deed gives up or grants away an incident of real property that is part of his or her condominium unit, or purchases a condominium unit that a predecessor in title has encumbered with restrictions or has conveyed away such rights, it is not the condominium association, in the exercise of its governance, that alters the rights. The rights are modified by the agreement of the owner/grantor (in this case coincidentally the Council of Unit Owners—the actual owners of the individual units) and the buyer/grantee. In this case, appellants' predecessors, by agreement, limited the incidents of ownership. This was simply a real property transaction in which condominium units were the objects of the sale. When appellants' predecessors in vertical privity agreed to, and executed, the deed containing the declaration of restrictions, it was not a condominium-style transaction involving governance, even

though the seller that joined in the creation of the restrictions was the Council of Unit Owners. In this instance, the Council of Unit Owners was not exercising its rights to govern the use of common elements or even the units. It was exercising its rights as the owner, not of common elements, but of individual units. For example, had the Council of Unit Owners not incorporated the restrictions in its deed to Sea Watch Store's predecessors in title, but that first predecessor in title had then created them in subsequent conveyances, it would be clear that the restrictions had not been created as a part of the governance of the condominium. We reiterate the condominium did not amend its bylaws to create the restrictions. This is, therefore, almost entirely a real property issue, not a condominium governance issue.

We cannot leave our discussion of the Court of Appeals's *Ridgely* without discussing a case that we decided between our *Ridgely* and the Court of Appeals's *Ridgely*. In *Alpert v. Le'Lisa Condominium,* 107 Md.App. 239, 667 A.2d 947 (1995), we affirmed a trial court that had upheld a nonunanimous decision of the condominium owners that passed a rule and amended the bylaws by assigning exclusive parking privileges to certain parking spaces. The original condominium documents classified the parking area merely as a general common element and, therefore, equally available to all owners. The Alperts bought a unit believing it had assigned to it a specific parking place because they had observed a parking place with the number of the unit they were purchasing affixed to it. After they finalized the purchase, the condominium governing body informed the Alperts that they had reassigned the covered parking place bearing their condominium unit's number to another unit that had been owned for a longer period of time. After a dispute developed, thirty-one of the thirty-two unit owners (The Alperts being the dissenting owner) amended the bylaws to give to the condominium the right to deny to the Alperts all use at all times of the specific parking space at issue by giving itself the power to assign specific spaces to specific units and to exclude all other unit owners from utilizing the assigned space. The old space was covered. The

new space assigned to the Alperts was not. On appeal to us, the Alperts raised the specific argument that the Court of Appeals resolved in its *Ridgely*:

[The Alperts] argue that Le'Lisa does not have the authority to designate specific parking spaces for the exclusive use of individual unit owners without amending the declaration by unanimous consent of the unit owners.... The Alperts further argue that to do so would encroach on each tenant's right to access and possession of the common elements, thereby prejudicing the rights of other tenants without each tenant's consent.

*Id.* at 246, 667 A.2d 947 (footnote omitted).

*Alpert* and the Court of Appeals's *Ridgely* are plainly inconsistent. The Court of Appeals has clearly stated, although it did not mention *Alpert* in that respect, that what was done in *Alpert* cannot be done. We were thus wrong in *Alpert*. Apparently, no appeal was taken in that case, and apparently *Alpert* was not in that respect brought to the Court of Appeals's attention in *Ridgely* because it was reviewing our *Ridgely*, which predated *Alpert*. It would be inappropriate to ignore one of our holdings that espoused a rule that we know has effectively been rejected by the high court. Accordingly, because we were incorrect in *Alpert,* we hereby expressly overrule its holding.

We return now to Judge Eschenburg's treatment of appellants' *ultra vires* argument. He rejected it, noting: "Nothing in Maryland's Condominium Act limits the application of restrictive covenants running with the land to condominium units, whether residential or commercial. Md. Real Prop. Code Ann., Section 11–101, *et seq.*" In so finding, the trial judge displayed a basic and fundamental understanding of the general law of real property and the way in which it may, on occasion, interact and affect a condominium regime.

We note the clearly compatible language of the statute that supports the trial court's finding. At the time of the conveyance of the eight stores to the 11500 Ocean Highway Limited Partnership, section 11–106 of the Real Property Article,

effective July 1, 1975, less than two months prior to the recording of the initial condominium documents (Declaration, Plat, and Bylaws), provided: "Each unit in a condominium has all of the incidents of real property." [14] Md.Code (1974, 1981 Supp.), § 11–106 of the Real Property Article. Section 11–109, "Council of unit owners," stated that a condominium council had the power:

(5) To transact its business . . .

(6) *To . . . sell, mortgage, lease . . . convey, transfer . . . and otherwise dispose of any part of its property and assets;* . . .

(8) *To acquire by purchase or in any other manner . . . and otherwise [to]* deal with any property, real or personal, or any interest therein, wherever located. [Emphasis added.]

Md.Code (1974, 1981 Supp.), § 11–109(d) of the Real Property Article. Accordingly, the Council of Unit Owners had the right to be an owner of property and was statutorily authorized to acquire the stores or any other property, sell the stores, and "deal" with them as a property owner in any way in which property may be managed or conveyed by any owner. As to the store units here involved, the Council of Unit Owners was clearly exercising its right as an owner and a grantor, i.e., one of the declarants creating the restrictions imposed by the deed. The trial judge went on to find that the restrictions were in fact reasonable. The trial judge then looked at each alleged violation of the restrictions and the reasonableness of each particular restriction as applied. We shall shortly journey where Judge Eschenburg traveled. First, we review some of Maryland's more recent cases dealing with restrictions on real property that are created in a chain of title.

We stated in *Bright v. Lake Linganore Ass'n*, 104 Md.App. 394, 414, 656 A.2d 377 (1995):

---

14. This language is the same as current section 11–106(a). *See* Md. Code (1974, 1996 Repl.Vol.), § 11–106(a) of the Real Property Article.

"... [I]n the construction of deeds ... the intention of the parties shall prevail unless it violates or infringes some established principle of law. To ascertain this meaning and intent of the parties resort must be had to the whole deed that every word of it may take effect and none be rejected...."

*Logsdon v. Brailer Mining Co.*, 143 Md. 463, 474–75, 123 A. 113 (1923) (emphasis added, citations omitted). See also ... *McKenrick v. Savings Bank*, 174 Md. 118, 128, 197 A. 580 (1938) (Even when covenants do not expressly provide words of inheritance or running with the land language, "if ... it was the intention ... that the restrictions were part of a uniform general scheme or plan ... which should affect the land granted and ... retained alike, they may be enforced in equity...."); *Legum v. Carlin*, 168 Md. 191, 194, 177 A. 287 (1935) ("Where the intention is clearly ... manifested by the language used ... it will be gathered from the words used....").

In the present case, the deed creating the restrictions notes that the grantee was to hold the property "unto" itself and "[i]ts successors and assigns, forever, in fee simple," subject to the restrictions. The restrictions were to be "binding upon the [grantee], its successors and assigns" and to "run with, bind, benefit and burden the Store Units." We stated in *Bright:* "Another and more fundamental rule, we think, is involved-that unless some positive rule of law is contravened, *every part of a deed is to be given effect, if possible, and the intention of the parties must prevail.*" 104 Md.App. at 416, 656 A.2d 377 (*quoting Adams v. Parater*, 206 Md. 224, 111 A.2d 590 (1955)). In the present case, the intentions of the Council of Unit Owners, as the owner of the store units, and 11500 Ocean Highway Limited Partnership were crystal clear. Appellants' attempt to obscure the clear intent of the restrictions by attempting to create a conflict between the condominium statute, the condominium documents, and the deed is ineffective. The law is clear.

The trial court in the case *sub judice* discussed the privity of the parties in 1976. Beyond that, however, is a require-

ment that there be a more important privity of estate that exists in the case sub judice. In *Bright*, we commented on our cases that adopted the modern view of privity of estate and discussed extensively our prior case of *Gallagher v. Bell*, 69 Md.App. 199, 516 A.2d 1028 (1986), *cert. denied*, 308 Md. 382, 519 A.2d 1283 (1987). See 104 Md.App. at 417–20, 656 A.2d 377. We said in *Bright*:

> We then discussed the "modern view" of privity that abolished the requirements of both horizontal and mutual privity, retaining only the requirement of vertical privity, *i.e.*, the person receiving the benefit or bearing the burden of the covenant is a successor in title to the original covenantor or covenantee. [*Gallagher*, 69 Md.App.] at 216–17, 516 A.2d 1028. We saw nothing precluding the adoption of the "modern view" and, though not in express language, applied that view by stating that "vertical privity" focused on devolutional relationships, where we perceived "the focus should be." *Id.* at 217, 516 A.2d 1028.

While our cases have discussed vertical privity, perhaps one of the simplest explanations of the difference between "vertical" and "horizontal" privity is found in the North Carolina covenant case of *Runyon v. Paley*, 331 N.C. 293, 416 S.E.2d 177, 184–85 (1992):

> [M]ost states require two types of privity: (1) privity of estate between the covenantor and covenantee at the time the covenant was created ("horizontal privity"), and (2) privity of estate between the covenanting parties and their successors in interest ("vertical privity")....
>
> ....
>
> ... The mere fact that defendants and plaintiff ... did not acquire the property directly from the original covenanting parties is of no moment. Regardless of the number of conveyances that transpired, defendants and plaintiff ... have succeeded to the estates then held by the covenantor and covenantee, and thus they are in vertical privity....
>
> ....

Where ... the restriction is contained in the chain of title, we have not hesitated to enforce the restriction against a subsequent purchaser when the court may reasonably infer that the covenant was created for the benefit of the party seeking enforcement.

104 Md.App. at 419–20, 656 A.2d 377. We held in *Bright:*

[V]ertical privity of estate exists. Thus, the charge at issue follows the land (the lots); it runs with and binds the land. This is further evidenced by the general plan of development, discussed in greater detail, infra, and by the language of the Key Deeds, and other deeds, declaring the covenants to run with the land.

*Id.* at 420, 656 A.2d 377. No plausible argument can be made that the deed restrictions in this case do not run with the land and burden the owner of the units at issue—appellant Sea Watch Stores. In light of the great weight of evidence and of the law, appellants' attempts to resist the enforcement of the deed restrictions, looked at in the best light possible, are frivolous. The restrictions contained in the deed are clearly applicable.

In our *Markey v. Wolf,* 92 Md.App. 137, 607 A.2d 82 (1992), a case in which property owners in a subdivision were attempting to force on a party their interpretation of a restriction regarding the required cost of houses that were built in that subdivision, we noted:

As we have said, the imposition of restrictive covenants is almost universally recognized. A more difficult problem is the interpretation of such covenants. From the very early days of subdivision development, the cases have been concerned primarily with the adoption and applicability of rules of construction. Generally, covenants have been construed narrowly and strictly though in more recent years a "reasonableness rule" (termed a modern rule in some foreign jurisdictions) has been engrafted upon the general rule.

We explain the metamorphosis as it occurred in Maryland and other jurisdictions.[15]

*Id.* at 149–50, 607 A.2d 82. Quoting from *Himmel v. Hendler,* 161 Md. 181, 187–88, 155 A. 316 (1931), we further opined:

In interpreting words used to create restrictions, the court should endeavor to ascertain the real purpose and intention of *the parties and to discover the purpose from the surrounding circumstances at the time of the creation of the restriction,* as well as from the words used. In endeavoring to arrive at the intention, the words used should be taken in their ordinary and popular sense, unless it plainly appears from the context that the parties intended to use them in a different sense, *or that they have acquired a peculiar or special meaning in respect to the particular subject-matter.*

*Markey,* 92 Md.App. at 153, 607 A.2d 82. We noted in *Markey* that the Court of Appeals in *Turner v. Brocato,* 206 Md. 336, 111 A.2d 855 (1955), had emphasized the need to give effect to the intentions of the parties. In *Belleview Constr. Co. v. Rugby Hall Community Ass'n,* 321 Md. 152, 158, 582 A.2d 493 (1990), the Court stated: "The rule of strict construction should not be employed ... to defeat a restrictive covenant that is clear on its face, *or is clear when considered in light of the surrounding circumstances.*" See also *Markey,* 92 Md.App. at 156, 607 A.2d 82.

Having been instructed by the Court of Appeals and guided by our own decisions, we now address the trial court's specific findings as to the allegations and contentions of appellee. We are mindful that in reviewing a trial court's findings of fact, we are somewhat constrained. Unless its findings of fact are clearly erroneous, we must affirm.

Maryland Rule 8–131(c) provides that in an action tried without a jury an appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." The

---

15. See *Markey,* 92 Md.App. at 150–56, 607 A.2d 82, for a discussion of that "metamorphosis."

Court of Appeals in the civil forfeiture case of *$3,417.46 U.S. Money v. Kinnamon*, 326 Md. 141, 149, 604 A.2d 64 (1992), reiterated the longstanding appellate rule that decisions of a trial judge will not be overturned on the evidence unless clearly erroneous:

> In *Ryan v. Thurston*, 276 Md. 390, 391–92, 347 A.2d 834 (1975), we analogized the scope of review of a circuit court under Maryland Rule 1386 to that possessed by this Court and the Court of Special Appeals under former Maryland Rules 886 and 1086 (the provisions of both now being contained in Maryland Rule 8–131(c)). *See Housing Comm'n v. Lacey*, 322 Md. 56, 59, 585 A.2d 219 (1991). These rules have been consistently interpreted in our cases to require that appellate courts accept and be bound by findings of fact of the lower court unless they are clearly erroneous. And as we said in *Ryan v. Thurston, supra*, 276 Md. at 392, 347 A.2d 834, "[t]he appellate court must consider evidence produced at the trial in a light most favorable to the prevailing party and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed." Moreover, as we reiterated in *Housing Comm'n v. Lacey, supra*, 322 Md. at 59–60, 585 A.2d 219, the trial court is not only the judge of a witness's credibility but also of the weight to be attached to the evidence. It is thus plain that the appellate court should not substitute its judgment for that of the trial court on its findings of fact but will only determine whether those findings are clearly erroneous in light of the total evidence. See *Kowell Ford, Inc. v. Doolan*, 283 Md. 579, 584, 391 A.2d 840 (1978).

In *Weisman v. Connors*, 76 Md.App. 488, 500, 547 A.2d 636 (1988), *cert. denied*, 314 Md. 497, 551 A.2d 868 (1989), Judge Wilner, for this Court, stated:

> In a non-jury case, the appellate court does not evaluate conflicting evidence but assumes the truth of all evidence, and inferences fairly deducible from it, tending to support the findings of the trial court, and, on that basis, simply inquires whether there is any evidence legally sufficient to

support those findings. *See Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 517 A.2d 1122 (1986); *Carling Brewing Co. v. Belzner,* 15 Md.App. 406, 291 A.2d 175 (1972).

The appropriate standard in our review of a trial court's grant or denial of a petition for an injunction is whether the trial court's findings of fact are clearly erroneous and whether the trial court has abused its discretion in regard to the action it took based upon its fact-finding.

*Maryland Trust Co. v. Tulip Realty Co.,* 220 Md. 399, 153 A.2d 275 (1959), was a case that also involved restrictions imposed by deed on the use of real property, in that case a shopping center. The trial court, much as Judge Eschenburg here, ordered compliance with the restrictions. The Court of Appeals noted:

> That part of the chancellor's decree which required the erection of a wire fence . . . was proper. The chancellor, who had an opportunity to judge the credibility of the witnesses, concluded that the words and actions of some of the defendants were in direct and irreconcilable conflict, and found as a fact that Sedgemoor constructed . . . with the intention of . . . [violating a restriction]. In doing so, we cannot find that the chancellor *was clearly wrong.*

*Id.* at 410–11, 153 A.2d 275 (emphasis added). After explaining why it could not hold that the chancellor was clearly wrong, the Court directed its attention at the injunctive remedy:

> The Chancellor . . . required the . . . corporations . . . to erect the fence, which is the chief bone of contention in this controversy. What he did *in the exercise of his discretion* was clearly not erroneous. . . .
>
> . . . .
>
> . . . Moreover, we find no abuse of the discretion the chancellor exercised when he ordered the erection of a fence to prevent a threatened breach of the parking area covenants.

*Id.* at 412–14, 153 A.2d 275 (emphasis added) (footnotes omitted).

## The Trial Court's Findings

■ Judge Eschenburg addressed each of the restrictions separately. We shall review his findings in the same manner. In addressing A,[16] regarding deliveries to the store units through the front entrances, Judge Eschenburg stated:

> [Appellee] complains of commercial deliveries made to [appellants'] store units through the front entrances. [Appellee] introduced testimony of soft drink deliveries and of [appellants'] own employees moving merchandise through the lobby. The Court finds that these violations occurred. The Court further finds that the Restriction promotes the flow of traffic in the lobby area and, because other entrances are dedicated to delivery uses, does not unduly limit the [appellants'] ability to use their property for commercial purposes.

The evidence clearly supports the trial judge's findings as to the improper use of front entrances and the reasonableness of the restriction in that it "promotes the flow of traffic."

■ In respect to B, customer access through the rear door, the court found that appellants left the rear doors of the units open during business hours and encouraged customers to use the rear doors. There is evidence supporting that finding. The trial court found that the restriction was reasonable in that it promoted the "security" of the condominium and did not unduly limit access to the store units. We agree.

■ The trial judge then found, in respect to appellants' operation of the stores after 11:00 p.m. (paragraph C of appellee's complaint), that appellants violated the provision by allowing some of the stores to remain open twenty-four hours a day and removing the doors altogether after appellee began securing the doors. There is evidence to support his findings. He further found the restriction to be reasonable in that it was designed to, and in the trial court's opinion did, promote

---

16. In discussing the individual allegations, we use the same letters that were used in the complaint and in this opinion, *supra*.

tranquility and foster the primarily residential aspect of the complex. We concur.

■ The court, in respect to D, regarding the placement of objects in the common elements, found that there was evidence that appellants placed tables and chairs in the common element areas in violation of the restriction "apparently under a claim of ownership of these areas." Thereafter, when appellants finally removed the table and chairs, the trial court found that appellants allowed "rubbish and debris" to remain on the common elements. There is evidence to support those findings. Judge Eschenburg found that the restriction was reasonable. We again agree.

■ In respect to E, the allegation that appellants caused offensive odors, the court found that the restriction "on the emission of noxious odors ... [was] ... reasonable ... because the result could be inconsistent with the residential use of the remainder of the condominium." We likewise agree. The trial court, however, did not find that the violations of this restriction had been sufficiently significant to constitute an "excessive emission." The court did not order an injunction in reference to this issue. There has been no cross-appeal taken in respect to it. Accordingly, we need not address it further.

■ In respect to F, the assertion that appellants were operating a public arcade, in violation of the zoning laws of Ocean City, the court opined:

[Appellee] complains of the [appellants'] operation of a public arcade, containing more than four arcade machines and open to the general public, in violation of the Town of Ocean City's Zoning Code. The Court is persuaded by testimony introduced at the hearing that such violations occurred regularly. [Appellants] knew that they were operating a public arcade without the proper licenses and continued to operate it in the face of complaints. [Appellants] are therefore enjoined from operating more than four arcade machines in any store unit without an arcade license, or otherwise violating zoning ordinances.

The deed restrictions require that all stores "be operated in compliance with all ... building [and] zoning ... laws." The town's zoning administrator testified that when he informed appellants that the arcade needed to be limited to four machines, rather than the fifteen machines sometimes situated in one store, he was informed by appellants that they were operating a "game room" on the condominium's behalf, *i.e.*, a condominium game room. The evidence was clear that the condominium operated its own game room at a different location. Moreover, the zoning administrator testified that if those stores containing the machines were open to the general public, they were not "in a legal status." There was evidence that the stores were open to the general public. Appellants even took the doors off the stores to allow the general public to have access to the stores twenty-four hours a day. We hold that Judge Eschenburg was neither clearly erroneous in his findings of fact nor did he abuse his discretion in enjoining the operation of the arcade.

 The complaint, in allegation G, asserted that appellants had "[p]lac[ed] signs upon the store units in violation of sign requirements and without Board of Directors['] approval." The deed restrictions state that a store owner may erect a sign so long as the appropriateness of it is "determined by the Board of Directors of the Council." The deed restrictions also state that, unless permitted by the board, "no signs may be erected or placed on or within any Store Unit closer than five feet from the front or rear boundary thereof without the prior written approval of the Board of Directors of the Council." We emphasize again that this is a restriction found in the deed. A similar provision is also in the condominium bylaws. For our present purposes, we consider only the deed restrictions. The trial judge found that the sign restrictions were reasonable "in the interest of maintaining the visual harmony of the condominium." We agree. The trial judge further found that there was evidence before him from which an inference could be made that "unapproved signs" were "plac[ed] ... on the common elements ... [and] within five feet of the front windows." There was evidence that at least

some of these signs were electronic message boards and neon signs. He further considered evidence that "directional arrow and portable signs" had been placed in the common elements. The trial judge found that the use and placement of the signs violated the restrictions. He was not clearly erroneous. In enjoining such forbidden activities, he did not abuse his discretion.

 In averment H, the complaint asserted that appellants, by the actions complained of, were challenging appellee's right to manage and regulate the condominium, appropriating the general elements for its sole use—including using the common elements for storage, customer access, and store promotion—and attempting to use (sell the use of) the condominium's recreational amenities. The deed restrictions specifically state:

Guests, invitees, licensees, *tenants and customers* of Store Units may use the general common elements of Sea Watch Condominium *only for purposes of ingress and egress to and from those Units.* Without limiting the generality of the preceding sentence, no such guests, invitees, licensees, tenants, or customers, as such, shall be permitted to loiter in the common areas ... *nor shall they be permitted* to use the common element bathrooms, or the common element game rooms, swimming pools, tennis courts, or other recreational facilities of the Condominium. [Emphasis added.]

In the face of this clear, unambiguous, and precise restriction, appellants, in their post-hearing memorandum, argued that

[p]lacing tables and chairs ... adjacent to the tennis courts and play ground would ... enhance that area ... as well as [appellants'] temporary innocuous use of other common areas. [Appellee's] absolute prohibition of the reasonable use of the common elements goes too far and is unreasonable.

... [T]he Use and Access Rules ... are unreason-

able.... [ [17]]

Appellee, replying to appellants' post-hearing memorandum, noted

> [Appellants] ... continue to make the mistaken assumption that the Store Restrictions [the deed restrictions] are mere rules imposed by the Council of Unit Owners, when in fact they are restrictive covenants running with the land.... [T]he Store Restrictions were placed on the commercial units before any of ... those units had been sold to the public....
>
> ... In the same way that purchasers of a subdivision lot are bound by any restrictive covenants placed on the subdivision because those covenants are part of the title of the lot, so the owners of the commercial units are bound by the Store Restrictions.

Appellee's counsel was correct.

Judge Eschenburg found the restrictions to be reasonable. He opined:

> [Appellants] knew the rules [restrictions] when they purchased the store units. [Appellants] now want to change the rules because it suits them economically. [Appellants] do not have the authority to unilaterally change these Restrictions, and the Court cannot allow the Restrictions to be ignored.... Because the violations were so numerous and blatant and were performed with such arrogance, the Court finds that the [appellants] intentionally acted in derogation of known Restrictions, gambling that the high cost of litigation would prevent the [appellee's] enforcement of these Restrictions.

---

**17.** Appellants seemingly ignore here, and throughout the proceedings below, the deed restrictions. They attempt to maintain their position without any reference to them, relying instead on their (erroneous in any event) construction of the restrictions and powers contained in the Condominium Declaration and Bylaws. Generally, as we have and hereafter indicate, appellants' issues are resolved against them, with little reference to those condominium provisions.

We cannot hold that the trial judge's factual findings were erroneous. The trial judge enjoined appellants from "appropriating general common elements" and from "engaging in commercial activities on the common elements." In granting that relief, the court did not, on the state of this record, abuse its discretion.

The aforegoing resolution leaves three matters to be determined by this Court: the breach of the wall separating two of the store units, what we refer to as the service mark issue, and the matter of attorney's fees. We shall address the breaching of the wall first.

 Preliminarily, we note that this issue involves both the deed restrictions and the Condominium Declaration and Bylaws. We first address the Condominium Declaration and Bylaws. Mr. Richardson, an Ocean City building inspector, testified that appellants' representative, Mr. Green, when applying for a permit to break the wall(s) in issue, represented that the wall was a "non-bearing—nonstructural wall"[.] He was asked by appellee's counsel:

Q Is, in fact, the wall a bearing wall—a structural wall?

A That's the question right at the moment. I've got a sealed set of plans here from a structural engineer ... that says cutting that doorway through that wall will have no structural effect.[ [18]]

Appellants apparently relied on that structural certification and on the provisions of Real Property section 11–115(3), which permits such activity so long as prior approval of the Council of Unit Owners is obtained. That section of the statute, however, is "[s]ubject to the provisions of the declaration or bylaws and other provisions of law." Md.Code (1974, 1996 Repl.Vol.) § 11–115 of the Real Property Article. Thus, that section would be inapplicable unless the Condominium

---

18. There was evidence below that appellants were observed with a jackhammer attempting to break through the wall from one unit to the other without a permit to do so.

Declaration and Bylaws and, in this case, the deed restrictions permitted appellants' actions.

On cross-examination, Mr. Smith, appellee's representative, was asked by appellants' trial attorney:

Q Do you recall Mr. Green applying for permission to open his door between his two units?

A Yes.

Q Would you tell the Court what the reasons were that the Board denied that?

A Yes. . . . I wrote a letter to Mr. Green about it, and I spelled it out.

. . . .

A Number 1, it's a load—bearing wall. It's a Sea Watch common element wall. . . .

Number 2, notwithstanding the engineer's comment, in order to alter a common element wall, it requires an amendment of the declaration . . . and it require[s] a hundred percent vote in favor by unit owners. That is virtually impossible. . . .[ [19] ]

. . . .

A As part of the criteria for us to even consider it, we wanted certification along with insurance and personal indemnification.

Mr. Green could not meet those requirements, but he did come up with his engineer. . . .

Q . . . [D]id you object to the certification . . . ?

A I never arrived at that objection or non-objection. There was criteria to meet to start, and that was his one [only] point. . . .

Q So the criteria was the insurance and the personal guarantee?

A Personal indemnification in case the wall fell.

. . . .

---

19. See *Ridgely, supra,* 343 Md. at 366, 681 A.2d 494.

A ... And we came up with that, the idea being that if we were properly insured and if Mr. Green could give us a personal guarantee, and we had a guarantee from an appropriate engineering firm ... that we would then consider going through.

Mr. Green refused two of three....

Q So its your position that the Board has the authority to require insurance and personal indemnification before a unit owner can open an opening in a wall?

A Yes. And we owe that to the man on the 20th Floor.

. . . .

A If the wall collapses, he'd be the first to get a lot of pain visited on him....

There are twenty stories above that store level.

We initially note that, pursuant to the condominium documents, even in the event nonstructural walls are involved, the individual units only include "in the case of non structural exterior partition walls enclosing the Unit" the area "to and including the interior dry walls thereof." Common elements encompass the area that is not within a unit. Therefore, in instances where a partition wall between units is not structural, the unit still only extends to the drywall. As to each unit, the exterior, i.e., all that outside the dry wall, i.e., between the units, is a general common element. Accordingly, the walls between the store units, whether structural or not, are common elements (although the dry wall is within a unit). Accordingly, appellants have no absolute right to breach that portion of the wall that is a common element.

The Condominium Declaration and Bylaws provide that no change or alteration may be made in a unit if it changes the "exterior" appearance unless the Board approves. This section of the condominium documents does not authorize any change in the common elements, *i.e.*, a break of the walls between units. We have found no provision in any of the condominium documents that would authorize a break in any wall or part of a wall of this condominium that constitutes a common element. Alterations to interior walls of a unit are

provided for, but not the common element portions of "partition" walls between units. Article VI, section 7(b) of the Bylaws, cited by the trial judge, provides a method for unit owners to get approval to make alterations "in his unit or installation located therein." By its terms, it excludes any alteration of a common element, *i.e.*, the common element portion of a partition wall between two units that is outside the boundaries of either unit.

Judge Eschenburg, in his resolution of this issue, also cited the deed restrictions. The deed restrictions provide that all stores must be operated in compliance with all building and zoning codes and all other applicable laws. There was evidence that the attempted jackhammering of the opening between the units occurred in the absence of a building permit. The deed restrictions also provide that no store unit can be operated in a way that might cause the necessity for additional insurance. Here, appellee requested proof of additional insurance protecting it from liability from appellants' actions prior to considering their request to make the opening. It was not forthcoming. Such a condition is, as the trial judge found, eminently reasonable. The deed restrictions also contain an express provision that in the event of any conflict between zoning laws, other governmental laws, and specific restrictions imposed by any deed or lease, "the most restrictive provision . . . shall be taken to govern and control."

Judge Eschenburg opined: "[Appellee] introduced evidence of [appellants'] attempts to create a doorway . . . without securing an appropriate building permit." Upon our review of the record, that evidence was before the trial judge. The judge inferred that appellee would not approve the issuance of a building permit because it considered the engineer, whose certification was on the application (the engineer was related to appellants' principal, Mr. Green), to be potentially biased and because appellants would not or could not provide the necessary insurance coverage and indemnification required by appellee to, in appellee's opinion, protect it from liability. The trial judge found that appellee's requirements were reasonable. We agree. He enjoined appellants from breaking an

opening between the units. In doing so, we hold that he did not abuse his discretion.

To the extent that section 11–115 of the Real Property Article is construed to permit the breaking of common element portions of partition walls when the Condominium Declaration and Bylaws that the statute is subject to do not expressly permit it (and the statute may apparently be susceptible to such a construction under some circumstances), prior approval, as required by the Bylaws, was not obtained in the present case because appellants could not meet appellee's reasonable requirements.[20] Moreover, such openings may not be made until after an amendment to the condominium documents has been made and recorded.[21] The evidence was uncontradicted that there was an insufficient number of unit owners willing to approve such an amendment.[22] When the statute is made expressly subject to the provisions of condominium documents that require a percentage vote for amendments that would be required in order to have the documents comply with the proposed changes, and that percentage cannot be obtained, then, and in that event, the statute, by its own terms, bows to the condominium documents.[23]

We perceive neither error nor abuse of discretion in the granting of injunctive relief.

---

20. Neither the Condominium Declaration nor the Bylaws permit the Board to approve a break *through* a common element portion of a partition wall.

21. Until that amendment is made, and, if necessary, the plats modified, the area between units would remain a general common element to which access for all unit owners could not be limited by less than all of the owners. *Ridgely, supra.*

22. The Condominium Declaration, in order to be amended, requires a unanimous vote of unit owners.

23. As we have noted, the amendment must precede the alterations because, if an amendment is not approved, the units as altered would not be consistent with the condominium declaration, bylaws, and condominium plats. This section of the statute merely legally permits what condominium documents provide for—if they provide for it. The documents at issue here do not.

## Real Property & Condominium Issues Summary

 As previously stated, we hold that real property held in condominium ownership retains all the incidents of real property. Moreover, we hold that deed restrictions may be imposed on a unit, or on several of the units of a condominium, just as they may be imposed on any other real property. Furthermore, we hold that when deed restrictions exist and others are imposed through the condominium documents, the unit or units are subject to the restrictions imposed by each manner of creation—*i.e.*, subject to the most restrictive so long as it is "reasonable." Additionally, we hold that when a condominium is also subject to the provisions of governmental regulation, *i.e.*, zoning, etc., as between the deed restrictions, condominium document restrictions, and governmental regulatory restrictions, the most restrictive apply.[24] Finally, we hold that if the condominium documents conflict with the provisions of Real Property Article section 11–115(3), the condominium documents control, because the statute is made "subject" to the condominium documents. Judge Eschenburg neither erred nor abuses his discretion in his resolution of these issues.

## Service Mark

 Appellee sought below to enjoin appellants' use of the service mark "Sea Watch." It was alleged, and there was evidence presented below, that the words "Sea Watch Condominium" had been used by appellee uninterruptedly since the condominium's creation in 1975.

Appellee's representative, Mr. Smith, indicated that the Sea Watch condominium had been harmed by Mr. Green's use of the term "Sea Watch" in the name of the entities he controlled. There was evidence that persons responding to appel-

---

**24.** It can be perceived that a governmental regulation might prohibit the only use that deed or condominium document restrictions permit. In such a case, the restrictions might be subject to "impossibility" review. We need not address this further as no questions of impossibility are here present.

lants' help-wanted advertisements applied to appellee's offices with some frequency. There was evidence that appellants, in an attempt to set up a "room service" in the condominium, distributed a "news letter" to all unit owners noting that "Sea Watch now has room service." Appellants' customers complained to appellee because they believed that appellee was providing the service. There was testimony that a purveyor refused to accept appellee's checks because, "We've had trouble with these Sea Watch checks." The checks it had had trouble with were appellants', not appellee's. The filing for bankruptcy by appellants led other entities to believe that appellee was in financial trouble. There were other allegations of harm as well. These allegations were supported by the evidence. There was testimony by Mr. Smith:

We have warned Mr. Green at the very beginning that Sea Watch has an excellent reputation at Ocean City. . . . We have received many accolades on management, and we have an excellent reputation in the town itself.

We told Mr. Green that by way of advertising at Sea Watch, and I'm talking about realtor advertising by way of renters coming to town and using our Sea Watch facilities over the years, and also by way of unit owners who have pride in Sea Watch and how it operates, that we did not want his store operation to cause sufficient confusion to impair or sully the reputation of Sea Watch as it stood in the community.

. . . [S]ome unit owners even jumped on me about, "What are you doing in the stores?" And we had to explain these were not our stores. Now, that's before he mailed out the "No Hassle" letter.

. . . [W]e've had renters come in and drop clothes off in our office, deliver packages, question us, and, of course, some complaints. And what are you saying? You apologize, and they leave. But they think it's us. They think that John Green's operation is Sea Watch. . . .

So from the standpoint of reputation, yes, I think we have been harmed severely, I think we have got real estate people now aware. In the bankruptcy proceeding alone, we

have had inquiries about are we in bankruptcy. And I don't think it's the words "Sea Watch". We don't have them copyrighted. But I think the stylistic design and the words "Sea Watch" coupled with the word "Club" or "The Club" leads someone to think that it's one and the same.

For an ad on a window to say "Sea Watch Deli", as identified earlier, is meaningless. Because you walk in the door and you're in Sea Watch and you see a deli. But when you say, "Club Sea Watch" to the United States, the world, or the city, they think of us, not Mr. Green.

## The Law

Service mark is statutorily defined as a name "use[d] to advertise or sell services that the person performs to identify those services ... and to distinguish them from services that another person performs." Md.Code (1992), § 1–401(c)(2) of the Business Regulation Article (BR). Trade name is defined as "a name, symbol, word or combination of 2 or more of these that a person uses to identify the business or occupation of the person and to distinguish it from the business or occupation of another person." BR § 1–401(f).

In the case *sub judice*, the service mark issue is not sought to be enforced under the statute. Appellee, in its complaint, correctly stated that common-law service marks are protected even if not registered under the statute. The statute itself preserves the enforceability of common-law trade or service marks.

Section 1–402, **"Effect of Subtitle,"** provides that "[t]his subtitle does not affect adversely a right or the enforcement of a right in a mark acquired in good faith at any time at common law." Likewise, the Attorney General has noted: "State trademark registration laws patterned after the Model State Bill have been adopted with some variations in 46 jurisdictions. In Maryland, as elsewhere, it is evident that such laws do not abridge the common law but, rather, simply affirm it." 67 Op. Att'y Gen. 380, 382 (1982).

In addition to the common-law right to enforcement, this Court notes the existence of criminal sanctions applicable to the improper use of a trade or service mark belonging to another. Section 1–415(a) of the Business Regulations Article provides: "a person may not, with intent to defraud, do business in the State under or imitate a name, title, or trade name that is the same as, or similar to, that used by another person already doing business in the state." The statute provides that fraudulent use or imitation of trade names is a misdemeanor and persons violating the section are subject to a penalty "not exceeding $100.00 for each day that the offense is committed." BR § 1–415(c).

The federal case of *Prestwick, Inc. v. Don Kelly Bldg. Co.*, 302 F.Supp. 1121 (D.Md.1969), involved a Maryland subdivision and common-law trade and service marks. The plaintiff in that case created a planned community known as "Tantallon." The defendant recorded a plat of land near the community called "Tantallon Square" without the permission of the plaintiff. Litigation arose after the defendant began a promotional campaign using the words "Tantallon Square." The parties stipulated that the use of the two names would likely cause confusion. The court stated:

[W]here an entrepreneur has successfully marketed a product, services, or combination of both, other business enterprises should not be permitted to usurp his good name and reputation or to confuse the public into misassociating the two. The use of ... Tantallon Square ... to describe his development is an infringement of the plaintiff's valid service mark and constitutes unfair competition for it attempts to usurp the good name and reputation of the plaintiff's service mark Tantallon, and therefore, will be enjoined. It cannot be denied that the plaintiff has a legitimate right to the exclusive use of the name and that his services and the name by which he has chosen to connote them are entitled to be free from confusion with other products and services.

*Id.* at 1124–25. Another federal case arising out of Montgomery County, *Five Platters, Inc. v. Purdie,* 419 F.Supp. 372 (D.Md.1976), involved "The Platters," a popular singing group

of the 1950s. A different group in the 1970s began calling itself "The New Century Platters." Suit was filed when "The New Century Platters" appeared at a club in Montgomery County. The court held:

Because of the secondary meaning and valuable good will acquired by and associated with plaintiff's name and mark ... and the services rendered thereunder ... defendants' use of the word "Platters," alone and in conjunction with other words, has created a likelihood of confusion among the type of consumers to whom plaintiff's group and defendants' group appeal.

... Defendants made unauthorized use of the word "Platters" ... and defendant chose the name ... with the intention of exploiting the popular recognition of plaintiff's name and mark ... so as to cause a likelihood of confusion among a significant number of persons in the consuming public.

*Id.* at 386.

The Court of Appeals in *National Shoe Stores Co. v. National Shoes, Inc.*, 213 Md. 328, 131 A.2d 909 (1957), discussed the "Distinctive Unique or Fanciful" and the "secondary meaning" requirements for the protection of trade names, although it found that neither existed. The first of these requirements involves the protection of a name consisting of distinctive, unique, or fanciful words:

[U]sually, the appropriation of such words alone is sufficient to give rise to a protect ible right in the name. The trial court found that the words "National Shoes" are not fanciful or distinctive and thus not subject to exclusive appropriation.... As pointed out in *Edmondson Vil[lage] Theatre[, Inc.] v. Einbinder,* 208 Md. 38, 46 [116 A.2d 377 (1955) ] ... a corporation, like an individual, generally has a right to use its own name, in the absence of any fraudulent or wrongful intention or act, or any contract to prohibit it.

The second category consists of cases where actual fraud or deceit is employed by a subsequent user of a name for the purpose of diverting the trade of a prior user. See

*[Baltimore] Bedding Corp. v. Moses,* 182 Md. 229 [34 A.2d 338 (1943)]. Indeed such action, with intent to defraud, may constitute a criminal offense. See Code (1951), Art. 27, sec. 219.[ 25] ... The appellant does not claim actual fraud or deceit.[ 26]

The third category consists of cases affording protection to a name which, although it consists of words in common use taken from the public domain, has acquired a secondary meaning through association with the seller's product or business in the minds of the general public.... "... Hence comes the rule, first formulated in trade-mark cases, that there can be no exclusive appropriation of geographical words or words of quality.... It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the 'secondary meaning' theory. There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless *have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trademark.*"

... As stated in *Nims, Unfair Competition and Trade– Marks* (4th ed.), § 334: "Secondary meaning must be proved by a fair preponderance of the evidence...."

... According to what seems to be the better view, proof of actual confusion in specific instances is not necessary, nor

25. As before stated, it still constitutes a criminal offense.

26. In the case *sub judice,* appellee does claim that appellants employed actual fraud and deceit.

is the inquiry limited to the exact locations where competition is shown to occur, particularly under modern conditions.

*National Shoe,* 213 Md. at 336–38, 131 A.2d 909 (emphasis added) (citations omitted).

In the case *sub judice,* Judge Eschenburg found

that [appellee] does have a technical service mark in the name "Sea Watch," because the name is composed of "distinctive, unique or fanciful words." [Appellants] may properly be enjoined from the use of this name because " . . . usually the appropriation of such words alone is sufficient to give rise to a protectible right in the name." Such is the case here. The name is not, as [appellants] have argued, merely geographical. [Appellee] need not show that a secondary meaning has attached to the name because it is a technical service mark. Instead, [appellee], as the prior user[ ], [is] protected from its misappropriation.

. . . Looking to the Business Regulation Article of the Maryland Code, Section 1–401 et seq. (1992, Cum.Supp. 1994), [appellants] argue that service marks are only protected to prevent confusion as to the source of goods or services and, since it provides no goods or services, [appellee] does not need protection in this case. The Court finds instead that the protection of service marks extends to the instant case because there is—at a minimum—the likelihood of confusion about the provider of [appellants'] services.

Indeed, [appellee] has illustrated to the Court's satisfaction that actual confusion resulted from the similarity of names. [Appellee] has received complaints about [appellants'] services and has been contacted by potential employees of [appellants]. The Court finds that [appellee's] reputation has been injured by this confusion as well. A grocery chain was reluctant to honor [appellee's] checks after having difficulty with [appellants'] checks, and a paint company questioned [appellee] about its financial condition after learning of the bankruptcy filing of [appellants] Sea Watch Stores, L.L.C., and the Club at Sea Watch. Because the

Court finds actual confusion and injury to [appellee] as a result of the similarity of names, [appellants] are enjoined from using the name "Sea Watch" in any connection with their commercial activities. [Citations omitted.]

We agree completely with the trial judge that a condominium's name may be entitled to service or trademark protection under the common law and that, in the present case, Sea Watch Condominium was so entitled. We note, although we do not so hold, that in addition to the actual finding of the trial judge that the words were sufficiently unique to meet the requirements of a service mark, there may well have been sufficient evidence to establish a "secondary meaning" application. As the trial judge did not expressly so find, we shall not address it further.

We will briefly address appellants' argument made below that a condominium does no business. This is incorrect. The Council of Unit Owners, through its Board of Directors and any properly designated managers, in addition to administering the governance of the condominium, is charged with maintaining and regulating its common elements. The Council of Unit Owners has the power to sue and be sued, transact its business, make contracts, incur liabilities, borrow money, sell or dispose of property, issue bonds and notes, incur obligations to invest funds, cause additional improvements to be made, rent portions of the common elements, procure insurance, and do any other act not inconsistent with law.

In exercising these powers, the condominium does business with banks by establishing accounts from which it pays its bills; it enters into franchise arrangements with vendors (from whom Sea Watch Condominium received over $25,000 in the year preceding the filing of the suit); it provides maintenance service for the grounds, garage, and tennis courts and for cleaning of common elements and the pools. Additionally, in most, if not all, Ocean City condominiums, units are regularly proffered for vacation rentals. Employees are hired (including ten to twenty security guards at the Sea Watch Condominium). Although many of its services are directed

inward, the governing body, the Council of Unit Owners, has regular business contacts with purveyors, insurers, and prospective employees; the Council would generally be required to obtain workers' compensation insurance for its employees and would be required to withhold taxes from those employees and forward them to the appropriate governmental agency.

The misuse of its name can be no less damaging to it than the misuse of the name of a Ma–and–Pa store in Kleig Grange or Hungrytown.[27] We agree with Judge Eschenburg and shall affirm his grant of injunctive relief to appellee in respect to its service or trademark.

### Attorney's Fees

Appellants assert on appeal that "[i]n an important respect, . . . [they] were the prevailing parties." We have examined the proceedings below and our holdings, and the only thing the trial court did not enjoin was the "noxious odors." In the context of the entire proceedings, this assertion of appellants does not constitute an "important" matter. Appellants appeared to base most of the remainder of their argument in their original brief on the assertion that, because the trial judge did not make the requisite findings, he could not assess attorney's fees as a sanction. We perceive that appellants have subsequently waived their reliance on their sanctions argument. We explain.

Where attorney's fees are assessed as sanctions under Md. Rule 1–341, *Johnson v. Wright*, 92 Md.App. 179, 182, 607 A.2d 103 (1992), holds that hearings to determine such sums imposed as sanctions are collateral to the action on the merits of a case and thus do not extend the time for the filing of appeal. Recognizing this law, appellee filed a motion to dismiss appellants' appeal of the trial court's findings on the merits as being untimely. Appellants, in their reply brief, seem to abandon (understandably) the assertion made in the primary brief that the award of attorney's fees had been made as a sanction.

---

**27.** Areas of Worcester County not normally visited by tourists or a majority of this panel of the Court.

They assert that "[t]his action is governed by a separate line of cases.... Those cases hold that attorneys' fees claims which are central to the main action must be resolved before a judgment can become final." Appellants cite *Mattvidi Assocs. Ltd. Partnership v. NationsBank of Virginia*, 100 Md.App. 71, 639 A.2d 228 (1994), in which the provisions for attorney's fees were contained in the loan documents, *i.e.*, by agreement, and *Northern Assurance Co. v. EDP Floors, Inc.*, 311 Md. 217, 533 A.2d 682 (1987), in which counsel fees were sought as damages for a breach of contract. Appellants conclude in their reply brief that

[b]ecause the claim for attorneys' fees was raised in the complaint, as part of the claim for relief requested by the Council, and not as a collateral matter focusing upon the parties' conduct during litigation, the attorneys' fees award constituted the rendering of final judgment on the entire case, making the notice of appeal timely as to all issues.

Moreover, at oral argument, appellants asserted that the fees had been central to the action and not collateral and we, therefore, consider that appellants further waived their sanctions agreement.

Accordingly, we perceive that appellants have abandoned and waived the issues they initially raised in their first brief, i.e., that the attorney's fees were imposed as sanctions under Md. Rule 1–341 and that because the trial judge failed to utter the words "bad faith," he had made insufficient findings. We note that we fail, in any event, to perceive merit in appellants' original argument as to sanctions. We shall hold that Judge Eschenburg neither erred nor abused his discretion in his award of counsel fees.

We shall primarily address provisions for attorney's fees contained in the deed restrictions. During this discussion, other less important matters will also be resolved.

Some provisions of the deed declaration provide: "The Council shall be reimbursed by the Owner ... for any liability or expense which it incurs as a result of the conduct of tenants, customers, invitees or licensees of that Unit.... The

Council shall have the right to collect such expenses, together with the costs of collection and reasonable attorney's fees by means of a special assessment." In another section, pertaining to insurance, similar language is used. Other sections also include similar language. This type of language generally relates to the appellee's self-help efforts to curtail violations. Several sections of the "Condominium Declaration and By-laws" also contains similar "assessment" language.

But *however,* the deed section, *i.e.,* section 10(a), is concerned with enforcement of the deed restrictions. That is what this lawsuit is about, and that section provides that when litigation is required to enforce the covenants, the party succeeding in enforcing them "may be awarded court costs and reasonable attorney's fees against the owner of such unit." Almost all of the trial court's orders, except the service mark issue, relate to the enforceability of the deed restrictions.[28]

Attorney's fees in the case *sub judice* may be considered under two documentary provisions, *i.e.,* (1) the Deed of Restrictions, and (2) the provisions contained in the "Condominium Declaration" and Bylaws. The fees relating to issues resolved under the provisions of the Deed of Restriction are collectible in this action as it is provided in that deed that they may be so awarded.[29]

The way in which attorney's fees are assessed and collected, however, is treated differently in the "Condominium Declaration" and Bylaws. The condominium bylaws provide:

All costs of taking such action, including ... counsel fees, and all other costs and expenses incurred in connection therewith, shall be a charge against a unit owner who, or whose tenant, causes such breach, payable to the Council on an individual assessment basis.

---

**28.** No separate argument as to attorney's fees is made on appeal relating solely to the service mark count. Nor was any such argument made below. Accordingly, it is waived.

**29.** Contractual provisions for the payment of attorney's fees and costs in litigation are an exception to the "American Rule" that holds generally that each person is responsible for their own fees and costs.

Such assessments are collectible pursuant to statutes that provide for the enforcement of such assessments and their collection through the lien process.

As to attorney's fees, this case is, however, primarily based on, as we have said, the enforcement of rights contained in the deed restrictions, for which costs and attorney's fees are collectible in the suit itself. Had appellee sought attorney's fees based upon the Condominium Declaration and Bylaws, they could not have been awarded in this suit over appellant's objections, if any had been made, but would have had to have been sought through the assessment and procedures provided for the collection of condominium liens.

As to the distinction between the method provided for in the deed and the method provided for in the condominium documents, we have read the transcript of the special hearing held on the matter of counsel fees. No objection was made below, that we have found, in which appellants challenged the award on the basis that the assessment/condominium-lien procedure had not been followed. Normally, if such an issue had been preserved, i.e., brought to the trial court's attention, we might be inclined to remand this issue to the trial court for a "sorting out" of the applicable and inapplicable method of the collection of fees and costs. Because at the trial level, appellants did not object on the basis that the method for collection contained in the "Condominium Declaration" should have been used, or assert whether that method or the method provided for in the deed restrictions should apply, the issue was not separately presented before the trial court. It is, therefore, waived by appellants and thus not preserved for our consideration. *See* Rule 8–131.

For the same reasons, appellants' argument that fees and costs could not be imposed under the provisions of the deed restrictions against a non-owner of the store unit is not preserved. During the hearing, the trial court made an initial observation in reference to Mr. and Mrs. Green's declaration of bankruptcy. Appellee's counsel then noted, "We are not proceeding against Mr. Green because he's in bankruptcy, nor

have we ever been proceeding against Mrs. Green." The court responded, "Sea Watch Stores and the Club At Sea Watch?" Appellee's counsel responded, "Yes, sir." The court then asked: "Only?" He answered, "Yes, sir." Appellants' trial lawyer made no objection. The following then occurred:

[APPELLANTS' TRIAL COUNSEL]: As regards to Mr. Green, I guess the stipulation from counsel here is that the proceedings [as to attorney's fees and litigation costs] is against the entities only.

THE COURT: That's correct.

[APPELLANTS' COUNSEL]: So with that understanding, I have no problem. . . .

Subsequently, at the conclusion of the hearing, the trial court ordered:

Just say the Court enters attorney's fees in the amount of . . . fifty-five thousand eight hundred two dollars fifty cents, and out of pocket expenses in the amount of seven thousand one hundred ninety-seven dollars and nineteen cents for a total of sixty-two thousand nine hundred ninety-nine dollars and sixty-nine cents in favor of Council of Unit Owners of Sea Watch Condominium . . . and against the two entities that we limited this to, Sea Watch Stores, LLC, Club At Sea Watch, LTD.

All right. Gentlemen, does that take care of it?

[APPELLEE'S COUNSEL]: Yes, sir.

[APPELLANTS' COUNSEL]: Thank you, Your Honor.

Subsequently, the docket entries reflect that the clerk entered the judgment for attorney's fees and costs exactly as the trial court had directed—against the two entities, Sea Watch Stores and The Club at Sea Watch, Ltd.

On appeal, appellants assert that if the fees were based on "any contractual provision . . . [the court] erred in imposing fees against any entity other than Sea Watch Stores, since only Sea Watch Stores is a unit owner." As can be seen from the exchanges above, this issue has been waived. Appellants did not object to the proceedings either initially when it was

first raised or at the end of the hearing when the trial judge invited their response. Moreover, appellants had "no problem" with proceeding in that fashion. Accordingly, this issue has not been preserved for our consideration. *See* Md. Rule 8–131.

At the conclusion of the proceedings below, appellants' counsel argued:

> We object to the attorney's fees obviously, one, on the grounds that the rate of two twenty-five is exorbitant for this area. Through the testimony of Mr. Collins and through my own testimony, it's an extraordinary rate for this area. And I think that's important. Fair and reasonable, I think, has to be measured against the market standards of the community.
>
> . . . .
>
> ... The case concerned a real estate issue. There was a conflict here. And I searched the law, and I believe Your Honor and your law clerk have searched the law. There is no case in Maryland which resolves the conflict between covenants in a deed which limit the freedom of the unit owners in a condominium as compared to what we call the due process in the condominium. . . .
>
> ... And, therefore, I would question sixty hours. And I think that number should be severely discounted. And that's our first objection, beyond the reasonableness of the rate itself, to be applied to the hours.
>
> . . . .
>
> So, basically, those are our key points,[30] with the exception of one, and that's the one I would like to address now.[31]

Appellee, in seeking counsel fees and costs, did so initially "in accordance with the aforesaid documentation." As far as

---

**30.** As we have indicated, at the hearing below, the argument against fees was premised on the rate charged and the number of hours expended—not on the differing methods for collection of fees.

**31.** The exception related to sanctions—an issue abandoned on appeal.

we know, that prayer for relief was the only motion or pleading pending before the trial court in respect to fees.

The trial judge reviewed the various bills and disallowed some of the fees (the court disallowed in its entirety the bills submitted in behalf of other of appellee's lawyers who were not present in court to justify their billings—this disallowance totaled over $20,000).

Although, as we have indicated, appellants questioned below the rate charged and number of hours upon which the award was based, they have abandoned that issue on appeal. Appellants, in their originally briefed argument on the issue of attorney's fees, do not challenge the rate charged or the dollar amount of the total award, except to note that the court should have taken into consideration that they prevailed to a substantial extent (an argument they never made below). Rule 8–131(a) provides, in relevant part, "the appellate court will not decide any . . . issue unless it plainly appears . . . to have been raised in or decided by the trial court. . . ." Rule 8–504(a)(5) requires a brief to contain "Argument in support of the parties position." We stated in *Beck v. Mangels,* 100 Md.App. 144, 149, 640 A.2d 236 (1994), that Rule 8–504(a)(5) required a party to present "argument in support of the parties position," citing several cases. In the case *sub judice,* appellants' position below, that the rates and amount were incorrect, is not argued on appeal. It is thus waived. In respect to the argument appellants make here, that the fees claimed should have been further reduced because they substantially prevailed, this assertion is factually incorrect. Moreover, appellants failed in their brief to direct our attention to where it sufficiently presented this issue to the trial judge. In our examination of the extract in respect to all of the issues, we did not come across sufficient indicia that this issue was presented to the trial judge. It is thus waived.

Additionally, as we have previously indicated, appellants, in their original brief, failed to raise the issue that attorney's fees might not have been applicable on the service mark issue. We have been unable to find in the extract where it was presented

below. For either and/or both of those reasons, it is not preserved for our review. In *Mangels,* we noted: "Our function is not to scour the record for error once a party notes an appeal and files a brief." *Mangels,* 100 Md.App. at 149, 640 A.2d 236 (quoting *Federal Land Bank, Inc. v. Esham,* 43 Md.App. 446, 406 A.2d 928 (1979)).

We hold that the fees and costs were awarded pursuant to contractual provisions. The trial court did not err or abuse its discretion as to attorney's fees. We shall, therefore, also affirm the trial court's award of counsel fees and litigation costs.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**