790 So.2d 525 (2001)
TORTOISE ISLAND HOMEOWNERS ASSOCIATION, INC., Appellant,
v.
TORTOISE ISLAND REALTY, INC., etc., Appellee.
No. 5D00-334.
District Court of Appeal of Florida, Fifth District.
July 13, 2001.
*527 Allan P. Whitehead of Frese, Nash & Hansen, P.A., Melbourne, for Appellant.
Pamela Huddleston and Elise A. Singer of Huddleston & Palumbo, P.A., Melbourne, for Appellee.

ON MOTION FOR REHEARING AND INCORPORATED MOTION FOR REHEARING EN BANC, ON MOTION FOR CLARIFICATION
SHARP, W., J.
We deny appellee's motion for rehearing and incorporated motion for rehearing en banc. We grant appellee's motion for clarification to the limited extent of correcting a typographical error in the first sentence *528 of the second full paragraph on page thirteen of the opinion. Accordingly, we withdraw our prior opinion and replace it with the following.
Tortoise Island Homeowners Association, Inc. appeals from a judgment denying it relief in its suit to enjoin the infringement and dilution of its trade name/service mark.[1] Although the words trade name, trademark, and service mark are often used interchangeably, they are different. A trade name is descriptive of the dealer or person and applies to a business and its good will; a trademark refers to vendible commodities and a service mark to services provided. Blanding Automotive Center, Inc. v. Blanding Automotive, Inc., 568 So.2d 490 (Fla. 1st DCA 1990). In this case, we are dealing with the protectability of the trade name "Tortoise Island" and infringement and dilution by Tortoise Island Realty, Inc.
In denying relief, the trial court ruled that the name "Tortoise Island" is "geographic," denoting an exclusive, high quality residential subdivision located in Satellite Beach, Florida, that its use by the plaintiff, as well as the defendant, had failed to garner a "secondary meaning," and that use of the picture of a tortoise or turtle in the Realty company's business sign, which was similar but not identical to the Association's logo and entrance sign, was not sufficiently similar to cause confusion as to services performed or potential injury to the Association's business reputation or dilution. We disagree and reverse.
The facts in this case are not in substantial dispute. The name, Tortoise Island, was one selected by the developer/owner of the spoil island and lands, which eventually became the community for which the Homeowners Association was formed to serve. Prior to its development, the area had no name. The owner/developer chose the name because when he first purchased the property for development, it was inhabited by numerous gopher tortoises and snapping turtles. He also selected a logo for his sales and promotional materials which depicted a symbol of a turtle or tortoise, although the kind of animal depicted varied from time to time. The streets in the community all have turtle or tortoise names.
The name "Tortoise Island" and the logo were used beginning in the late 1970s, to advertise the community and to sell lots. When the project was completed, it was turned over to the Homeowners Association. The Association is a non-profit corporation whose primary duties are to maintain the common property and amenities, and enforce the pertinent covenants and restrictions. Both parties agree that it is the only entity which can enforce the community's rights to the trade name/ mark, if such a right exists.
At the entrance to the Tortoise Island community, in front of the gate house, appears the sign "Tortoise Island" in large green block letters. Depicted above those words is a green tortoise. The sign has a curved top, to accommodate the tortoise. The sign is repeated on the gate house. Similar logos depicting a tortoise or turtle are used on the Association's letterheads, parking stickers, other signs, documents and telephone directories. The community has about 300 lots and the home prices average $300,000 to $350,000. The majority of residents are professionals, well-educated *529 and not usually first time home buyers.
Tortoise Island Realty, Inc. is wholly owned and operated by Thomas Palumbo. Palumbo has lived in the Tortoise Island community since June 1994. In November 1994, Palumbo formed the real estate company. Its office was located some distance from Tortoise Island. In 1998, he moved his business to an office located just outside the entrance to Tortoise Island. Above the office appear the words "Tortoise Island" in large green block letters. Just above those words, appears a picture of a turtle. The turtle is somewhat different in appearance than the one on the Tortoise Island entry sign but it too is placed under a curved top to accommodate its shape. Below the Tortoise Island block letters appears the word "Realty" surrounded by a white background.

Realty also uses the name and logo in connection with its advertisements in the newspapers, newsletters, and on a videotape used to sell or promote properties for sale in the area. Realty sells other residential properties outside Tortoise Island, as well as properties in the Tortoise Island community. Other Realtors also have listings for properties in Tortoise Island, and it is known in the real estate community that Palumbo does not have an exclusive right to sell Tortoise Island homes. Palumbo registered the name Tortoise Island Realty, Inc., and a turtle logo in Florida, in 1998, and with the United States Patent Trademark Office in 1999.
Palumbo testified that he chose the name Tortoise Island Realty because he wanted the public to know that he was located in Satellite Beach, and "everyone knows that Tortoise Island is in Satellite Beach." He denied that naming his company Tortoise Island Realty gave him any competitive advantage in listing and marketing homes in Tortoise Island. He denied trying to copy the general shape or design of the Tortoise Island entry sign. The reason his business was located next door to the Tortoise Island community was to be closer to his family.
The Association produced testimony that there was actual confusion on the part of the general public as to whether Realty and the Association were affiliated or one and the same business. The Association's *530 manager said she had received telephone calls and mail directed to the Realty company. A friend of the manager's mistakenly believed she worked for the Realty company. Another Association employee testified she received calls from people who had confused the Association with the Realty office. A contractor came to the Association's office looking for his check from the Realty company.
A real estate salesman testified that while he worked for Realty, the Realty office would receive telephone calls intended for the Association or the gate at Tortoise Island. A resident of Tortoise Island testified that a real estate agent took her family to Tortoise Island where they met Palumbo. She assumed she had to buy a home in Tortoise Island through Palumbo. A security guard who works at the gate house at Tortoise Island testified that many potential home buyers told him they believed Realty was part of Tortoise Island or that they had to go to Realty first before coming to the gate. Another real estate agent testified she had several customers who thought Realty was the exclusive agent for Tortoise Island.
Both parties, as well as the trial court, cite Great Southern Bank v. First Southern Bank, 625 So.2d 463 (Fla.1993) as the controlling trade name case for this state. In that case, the Florida Supreme Court relied on federal decisions interpreting comparable provisions of the Lanham Act,[2] "because section 495.181, directs that the federal cases be given great weight when construing chapter 495." In that case, First Southern Bank sued the Great Southern Bank for common law trade name infringement, common law unfair competition, and violation of section 495.151 (the anti-dilution statute adopted by the Florida Legislature). The major issue in that case was the proper classification of the name of the claimed trade name, which Justice Shaw held, was a question of law. Great Southern, 625 So.2d at 469. The Florida Supreme Court remanded to determine whether or not the trade name had acquired an inherent distinctiveness and uniqueness through the duration and extent of its use, duration and extent of advertising, and degree of recognition by prospective purchasers (a secondary meaning).
As Justice Shaw explained, names which are geographic and descriptive cannot be afforded trade name protection, unless the name or use has achieved a "secondary meaning." In order to have acquired a "secondary meaning" there must be evidence of extensive advertising and long and exclusive use, so that the trade name has acquired a sufficiently high degree of distinctiveness to justify protection. Great Southern, 625 So.2d at 470. To qualify, there must be a connection in the public's mind between the mark and the product's producer whether the producer is known or unknown. Restatement of the Law (Third) Unfair Competition § 13 comment e.
In this case, the trial judge ruled neither the Association nor Realty had proven any secondary meaning for the trade name and that there was no confusion in the mind of the public that the two were affiliated or that consumers of their products would be misled as to their source and identity. Such a finding is a mixed question of law and fact which must be supported by competent substantial evidence in the record. Great Southern, 625 So.2d at 470. However, proof of a secondary meaning is not required if the trademark or name sought to be protected is "distinctive"coined or fanciful, arbitrary *531 or suggestive. Great Southern, 625 So.2d at 467. The Association contends that its claimed trademark name is "arbitrary."
"Descriptive" marks include marks that are geographically descriptive. As stated in the Great Southern case:
Descriptive marks include marks that are simply descriptive, laudatory descriptive, and geographically descriptive. Thus:
`A mark is "descriptive" if it is descriptive of the intended purpose, function or use of the goods, the size of the goods, the class of users of the goods, a desirable characteristic of the goods, or the end effect upon the user.'
Marks that are merely `laudatory' and descriptive of the alleged merit of a product are also regarded as `descriptive'.
Great Southern, 625 So.2d at 468. Quoting Professor McCarthy, the court said:
[D]escriptive geographical terms are in the `public domain' in the sense that every seller should have the right to inform customers of the geographical origin of his goods.
* * *
A geographically descriptive term can indicate any geographic location on earth, such as continents, nations, regions, states, cities streets and addresses, areas of cities, rivers, and any other location referred to by a recognized name.
* * *
In order to determine whether or not the geographic term in question is descriptively used, the following [question is] relevant:
(1) Is the mark the name of a place or region from which the goods actually come? If the answer is yes, then the geographical term is probably used in a descriptive sense, and a secondary meaning is required for protection.
Great Southern, 625 So.2d at 468-469.
With regard to "arbitrary" trademarks or names, Great Southern quotes Professor McCarthy:
Arbitrary marks comprise those words, symbols, pictures, etc., that are in common linguistic use, but which, when used with the goods or services in issue, neither suggest nor describe any ingredient quality or characteristics of those goods or services.
* * *
`Arbitrary' means that the ordinary meaning of the word mark is applied to these goods in a totally arbitrary and non-descriptive sense. For example, IVORY soap is not made of ivory, OLD CROW whiskey is not distilled from old crows, and ROYAL baking powder is not used exclusively by royalty.
Great Southern, 625 So.2d at 468. Other examples are BLACK AND WHITE scotch whisky, ICE CREAM chewing gum, and APPLE computers. Quoting Restatement section 13, comment c, the court said that prospective purchasers are likely to perceive this designation as a symbol of identification.
How to classify a name chosen by a developer for a project is somewhat problematic, because although it may be originally "arbitrary," after completion it becomes connected with a place, the location of the project. Here we think "Tortoise Island" was originally arbitrary when used to identify the subdivision, although it would have been descriptively used in connection with an island upon which lived a large population of turtles or tortoises. *532 Further, it is clear that prior to the selection of the name and construction of the subdivision, there was no geographic place in the area with the name "Tortoise Island." Now, however, the name Tortoise Island has become connected to a real place and community. Does that render it "geographic" or "descriptive?"
The federal cases with similar facts and circumstances support the Association's argument. In Prestwick, Inc. v. Don Kelly Building Co., 302 F.Supp. 1121 (D.Md. 1969), Prestwick, the developer of Tantellon, an exclusive planned community created by the developer out of raw land, sought to enjoin the use of the name Tantellon Square by Don Kelly Building Company, a different developer, who was developing a different, nearby subdivision. Prestwick had picked the name Tantellon, arbitrarily. It is actually the name of a castle in Scotland. Prior to the development of the subdivision, Tantellon, there was no geographic place or name in the area using that name. The court granted injunctive relief in that case, holding that the name Tantellon is not geographic. The court found there was insufficient evidence adduced that the general area around the subdivision had come to be known as "Tantellon."
In contrast, in Dominion Federal Savings and Loan Ass'n v. Ridge Development Corporation, 1986 WL 15438 (E.D.Va.1986), the court denied injunctive relief to the developer of a large planned community with residential and commercial buildings, schools and other buildings. "Lake Ridge" was the name chosen for the project, and prior to its selection, the land was not known by or associated with that name. Dominion opened a branch bank on the border of the development and named it Lake Ridge, but it also used the name Dominion Federal Savings and Loan, and displayed its own logo. In denying relief, the court noted that commercial businesses and others in the developed area have been permitted to use the Lake Ridge name. It also concluded there was no evidence Dominion was attempting to exploit the good will of Lake Ridge. Rather, it sought to identify the location of its office. Further, the two businesses were not in competition and there was no likelihood of confusion on the part of the public.
In Pebble Beach Co. v. Tour 18 I, Ltd., 942 F.Supp. 1513 (S.D.Tx.1996), affirmed as modified, 155 F.3d 526 (5th Cir.1998) established (famous) golf-course operators sued a Texas golf-course operator to enjoin the use of their trade names, copying the plans of famous holes on their courses, and use of trademarks in advertising and in operating the Texas course. One argument made was that the names, Pebble Beach, Pinehurst and Harbortown, are geographic and thus not protectable as trademarks without proof of a secondary meaning. With regard to Pinehurst and Harbortown, which did not have incontestable, registered marks, the court ruled that the trademarks or names were arbitrary because they were chosen by the developers to designate the golf projects and there was an absence of any such name being connected to those places, prior to that time. The court discounted the geographic name defense, saying that if there is any present geographic connotation to the names, it had developed over time and is directly attributable to the growth and success of the respective resorts. It also concluded that the names had acquired a secondary meaning, although that was not a prerequisite for granting relief in that case.
Another case supportive of the Association's position is Sea Watch Stores, Ltd. Liability Co. v. Council of Unit Owners of Sea Watch Condominium, 115 Md.App. 5, 691 A.2d 750 (1997). The court upheld *533 injunctive relief for the Council (a condominium association) against owners of commercial condominium units being used as stores, to prevent them from using the name Sea Watch. That was the name selected for the original condominium project, for which the Council was then acting. The court said the name was distinctive, unique or fanciful, and thus protectable without need to show a secondary meaning. The court rejected the defense that the name was geographic. It also upheld the right of the Council to enforce the condominium's trademark name rights.
It appears that an "arbitrary" or fanciful name when attached to a place or location is generally protectable as a trade name or mark, without the necessity to prove a secondary meaning. However, if the name has been used by others near, in and around the area, so that what was once an arbitrary name has become, in the public mind, a geographic place, it is not protectable. No such evidence was adduced in this case.
The additional element which the Association had to establish in order to obtain injunctive relief was that use by Realty of the trade name was likely to cause confusion on the part of the public. The trial court denied that there was such likelihood of confusion, primarily because the two entities were not competing for the same business or markets. It found:
Neither the homeowners living on Tortoise Island nor the general public are confused as to services performed by Plaintiff and Defendant. Plaintiff only performs services for its members and the public knows that a homeowners association is not engaged in real estate brokerage.
In determining the "likelihood of confusion," courts should consider the following:
(1) the degree of resemblance between the conflicting designations;
(2) the similarity of the marketing methods and channels of distribution;
(3) the characteristics of the prospective purchasers and the degree of care they exercise;
(4) the degree of distinctiveness of the senior user's mark;
(5) where the goods or services are not competitive, the likelihood that prospective buyers would expect the senior user to expand into the field of the junior user;
(6) where the goods or services are sold in different territories, the extent to which the senior user's designation is known in the junior user's territory;
(7) the intent of the junior user; and
(8) evidence of actual confusion.
Great Southern Bank, 625 So.2d at 469-470.
With regard to the first factor, there is a high degree of similarity between the signs used by Realty and the one used by Tortoise Island to mark its entrance gate. The color and shape of the signs, the use of large, green, block lettering, for Tortoise Island, use of a turtle/tortoise above the lettering, and the proximity of the two signs can lead to no other conclusion.
Factors two through six are not particularly applicable to this case because the two parties are not in competition for the same business or trade. It appears the trial court gave that too much weight in this case. The Association is not attempting to protect its business as the servicing-maintenance agency for the community, but rather it is trying to protect the Association's common law interest in its trade name. The Association claims that Realty is trading on its reputation as an exclusive community and misleading the public into *534 believing it is the exclusive agent for home purchases in the community.
Non-profit corporations (like the Association) have the same interest in protecting their identities and goodwill as do profit-seeking enterprises. Restatement § 12 comment a. Here, the Association is acting in a capacity similar to that of the condominium association in Sea Watch. It is in charge of administering the business of the Association; it is charged with maintaining the common elements and enforcing regulations and has the power to sue and be sued, to transact business, make contracts, do business with banks and other entities, etc. The protection of trademark/names functions as an indirect form of consumer protection. Where there is a likelihood of confusion as to the identity of the provider of the services, the presence of a trademark/name can signify that the goods or services are sponsored or approved by a particular business. Restatement § 9 comment c. Realty's use of the name and turtle in a manner very similar to the community invites the suggestion that Realty is sponsored by, approved by, or affiliated in some way with the Tortoise Island subdivision.
The last factor, actual confusion, appears to have been established in this case. Proof of some actual confusion (and it need not be much), is sufficient to establish likelihood of confusion. As noted above, there was evidence in this case that both entities received mail and telephone calls intended for the other. There was also testimony that various members of the public were confused and misled about whether the two were affiliated, or whether Realty was the community's exclusive agent.[3] Even Realty's own witness, Alyea, testified she had several customers who thought Realty was the exclusive agent for the community.
In addition, the Association is entitled to relief under section 495.151, Florida Statutes, even if it had failed to establish a basis under trademark name infringement grounds. The statute provides:
495.151. Injury to business reputation; dilution
Every person, association, or union of workers adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and all courts having jurisdiction thereof shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.
In Great Southern, the court held that a dilution action differs from infringement, in that it does not necessarily depend on either there being competing goods or the likelihood of confusion. A violation of this section should be determined by 1) whether there is a likelihood of injury to business reputation, or 2) the dilution of the distinctive quality of the trademark name. A person can be enjoined from use under the statute if the actor uses a designation that resembles the distinctive mark of another, in a *535 manner likely to cause a reduction in the distinctiveness of the other's mark, or it tarnishes the images associated with the other's mark. See Marks v. Cayo Hueso, Ltd., 437 So.2d 775 (Fla. 3d DCA 1983); Tio Pepe, Inc. v. El Tio Pepe de Miami Restaurant, Inc., 523 So.2d 1158 (Fla. 3d DCA 1988), rev. denied, 534 So.2d 399 (Fla.1988). Whether the mark has acquired sufficient distinctiveness to be protected from dilution involves consideration of many factors, such as the duration and extent of advertising that emphasize the mark and the degree of recognition by prospective purchasers. Great Southern, 625 So.2d at 469.
As noted above, the record establishes that the Tortoise Island name is arbitrary and distinctive. It has been used since the late 1970s. The name and turtle logo are used on the entrance, guardhouse, streets, directories and newsletters. It has gained a reputation as an exclusive residential community. And the name and logo are commonly used by real estate agents to advertise properties exclusively in the community. We conclude that the trial court's finding that the quality of the Association's trade name is not threatened by Realty's use is not supported by competent substantial evidence. Indeed, use by Realty and others of the trade name Tortoise Island, would contribute to its loss of distinctiveness and hence, its protectability.
REVERSED and REMANDED for Further Proceedings Consistent with This Opinion.
PETERSON, J., and POWELL, R.W., Associate Judge, concur.
NOTES
[1] Trade name means any word, name, symbol, character, design, drawing, or device or any combination thereof adopted and used by a person to identify his or her business, vocation or occupation, or to distinguish it from the business, vocation or occupation of others. § 495.011(6), Fla. Stat.
[2] 15 U.S.C. § 1051, et seq.
[3] See Richard Store Co. v. Richard's Warehouse Sales & Auction Gallery, Inc., 63 So.2d 502 (Fla.1953).